PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

LINDA DAMERON KLOTH; BLAINE
COX; DEBRA CUNNINGHAM; ERIC
FERRELL; ELIZABETH STRICKLAND;
RENE GONZALEZ; CLAY TYLER; PETER
HAKLAR; ERIC S. LAZARUS; HAROLD
A. PHILLIPS; PAUL L. HOWARD;
THOMAS MCCALEB; VICKI MCCALEB;
JAMES WOODS; LEYTON T. BROWN;
GALE RUFFIN; JAY S. QUIGLEY; JOHN
W. REDMANN; JOHN GLASE; BRUCE
WRIGHT; EVANGELOS KRITIKOS;
WALTER LORELL; RENALDO VELTRI;
JOHANNA M. MCWHINNEY; JODI
MARKS; JUDD GOODMAN,
              *Plaintiffs-Appellants,*

              and                              No. 04-2566

PRECISION BILLING SERVICES,
INCORPORATED; MSC SYSTEMS,
INCORPORATED; O'SULLIVAN, HICKS &
PATTON; RYAN D. REYNOLDS;
ELEADERS, INCORPORATED; KBS-NET,
SA; SILVERWARE, LIMITED; DATA
UNIT AG; DATACROWN, LIMITED, On
Behalf of Themselves and All
Others Similarly Situated; WAYNE
MIMS; GRAVITY, INCORPORATED; 403
WEST LOOP 820 N; TO THE RESCUE
COMPREHENSIVE COMPUTER SERVICES;
D'S PET SUPPLIES, INCORPORATED;
DAVID BACH; THE RUBBRIGHT GROUP;

James M. Burt; Reclaim Center, Incorporated; Steven Nielsen; Raymond Pryor; Seastrom Associates Ltd; Chris Campbell; Denise Davenport; Sara Cheeseman; Ronald Rodjenski; Harold Phillips; Matthew W. O'Neill; Robert Weinke; Idy Klein; David Jaffee; Avi Mandel; South Dakota Association of Plumbing, Heating and Cooling Contractors; Johnnie Moon; Robert Lee Colebank; Bryan K. Manson; Fred Luce; Edward Michael O'Brien; Golf O'Brien Company; Cynthia M. Aikens; Clair Falgoust; Carlton Falgoust; Manual Knight; Webster T. Knight; James Rudasil; Aubrey Bernard; Geraldine Guice; William Brand Pryor; Pacific Coast Systems; Teri Gordon; Michael Shevekov; Martin Hagan; Elham Shirzai; Dawn Brandt; Donald J. Gianni; Mario Traffichini; John F. Siegenthaler; Caren M. McCall; Larry A. Penix; Pryce M. Haynes, II; John K. Heidlage; Ryan D. Reynolds; Daniel C. Ray; GTI System Integrators; Tziri Fine; Derek M. Prentice; Kurt C. Carter; James T. Brems; Tim Appelgate; Julie Tinkham; Steven Master; Thomas

INFANTE; TURNER CORPORATION; JOHN A. SUPERNOVICH; MARLENE K. SUPERNOVICH; SHERWOOD; AUTOMATIK DESIGN, INCORPORATED; STATE OF WEST VIRGINIA, ex rel. Darrell V. McGraw, Jr., Attorney General; NETSCAPE COMMUNICATIONS CORPORATION; SUN MICROSYSTEMS; BE INCORPORATED; BURST.COM, INCORPORATED; IVAX CORPORATION; KEITH COOPER; CONWAY, MACKENZIE & DUNLEAVY, PC; CHRISTINE BARTON; RHODA HENNING; KAREN GREEN; RENAE LUCAS; JOHN ROBY; JOHN DOES 1-50; MICHAEL LEWIS; HENRY MASCAGNI; HAYLEY J. GARDNER; STEVE GRUBB; LINDA STEWART; MURLINE ADDINGTON; TRAVIS D. MCHANN, JR.; BILLY LEWIS; BOOKER T. BAILEY, JR.; JAMES PIGG; ANGELA BRINKLEY; DELANIOUS HARRIED; GERTRUDE GREEN; CAMELIA CALVERT; MARY WYATT; EMMA WALTON; HETHA GREEN; REALNETWORKS, INCORPORATED; PRADEEP SUJAN; CARL C. CONRAD; PAUL A. DIETER; FRANKLIN L. DEJULIUS; KEVIN HUDDELL; GARY LEACH,

*Plaintiffs,*

v.

MICROSOFT CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(CA-00-1332-MDL; CA-00-2117-JFM)

Argued: February 1, 2006

Decided: April 18, 2006

Before WIDENER, NIEMEYER, and GREGORY, Circuit Judges.

---

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Widener and Judge Gregory joined.

---

**COUNSEL**

**ARGUED:** Christopher Lovell, LOVELL STEWART HALEBIAN, L.L.P., New York, New York, for Appellants. David Bruce Tulchin, SULLIVAN & CROMWELL, New York, New York, for Appellee. **ON BRIEF:** Gary S. Jacobson, LOVELL STEWART HALEBIAN, L.L.P., New York, New York, for Appellants. G. Stewart Webb, VENABLE, L.L.P., Baltimore, Maryland; Richard J. Wallis, Steven J. Aeschbacher, MICROSOFT CORPORATION, Redmond, Washington; Joseph E. Neuhaus, Richard C. Pepperman, II, Sharon L. Nelles, SULLIVAN & CROMWELL, L.L.P., New York, New York; Charles B. Casper, MONTGOMERY, MCCRACKEN, WALKER & RHOADS, L.L.P., Philadelphia, Pennsylvania, for Appellee.

---

**OPINION**

NIEMEYER, Circuit Judge:

This appeal, a part of the multidistrict class action antitrust litigation brought against Microsoft Corporation by 39 purchasers of Microsoft's operating system software and applications software,

presents the question whether 26 indirect purchasers have stated a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). The district court granted Microsoft's motion to dismiss their claims, concluding that because these 26 plaintiffs did not buy software directly from Microsoft, they were indirect purchasers who were barred from seeking recovery for illegal pass-through overcharges under the principles of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). The court also found that they lacked standing to seek recovery for certain types of injury because the alleged injury did not constitute "antitrust injury," was speculative, or was generalized and not specific to the plaintiffs. The court dismissed the plaintiffs' equitable claims under the doctrine of laches.

For the reasons that follow, we affirm.

I

In the aftermath of the United States' suit against Microsoft, in which Microsoft was found to have maintained an illegal monopoly in the worldwide market for licensing Intel-compatible PC operating systems, *see United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001), numerous class action suits were filed against Microsoft in courts across the country. On April 25, 2000, the Judicial Panel on Multidistrict Litigation transferred the cases that were pending in federal district courts to the District of Maryland, pursuant to 28 U.S.C. § 1407. Thereafter, 39 plaintiffs filed a superseding consolidated amended complaint, seeking damages and equitable relief under the Clayton and Sherman Acts. *See* 15 U.S.C. §§ 2, 15, 26.

In their 66-page consolidated amended complaint, the plaintiffs allege that beginning in the late 1980s, when Microsoft's market share in the United States for operating system software was 95 percent, Microsoft engaged in a series of predatory acts that were designed to, and did, eliminate competition and prevent entry into the operating system software market. They allege that since 1994, when Digital Research, Inc. and IBM were eliminated as meaningful competitors, Microsoft has had no significant competitor in the operating systems software market. They assert that Microsoft used this monopoly power to raise prices and to leverage its power into other markets, including markets for applications software such as word processing,

spreadsheet, and office suite software, with the result that Microsoft has dominated these applications software markets since the mid-1990s, achieving market shares approaching 90 percent. Thus, for the time periods material to the complaint, the plaintiffs contend that Microsoft has had monopoly power in four product markets:

> (1) The licensing of Intel-compatible personal computer *operating systems* software; (2) the licensing of Intel-compatible personal computer *word processing* applications software; (3) the licensing of Intel-compatible personal computer *spreadsheet* applications software; and (4) the licensing of Intel-compatible personal computer *office suite* applications software.

The plaintiffs allege that Microsoft maintained and advanced its monopoly power by refusing *to sell* its software to manufacturers, retailers, and consumers. Instead, they allege, Microsoft employed a two-tier licensing system. It used one type of license for transactions with "original equipment manufacturers" ("OEMs"), allowing them to preinstall software on personal computers, which they in turn sold to consumers or "end-users." The plaintiffs claim that Microsoft was able to require OEMs to accept the terms of Microsoft's licensing agreement, forcing the OEMs to preinstall Microsoft operating systems on personal computers they sell and to act as Microsoft's agents in offering a second type of license, called "end-user license agreements" ("EULAs"), for acceptance or rejection by consumers under terms dictated by Microsoft. To use Microsoft software, the end-users were required to agree to the EULAs, which provided, among other things, a Microsoft-funded refund to the end-user if the end-user declined to enter into the EULA. The EULAs imposed significant restrictions on use of the software by the licensee, giving Microsoft remedies against the end-user for breach of the license agreement. The complaint alleges in a similar manner that Microsoft dictated the terms and conditions under which distributors and retailers were able to sell EULAs.

The plaintiffs claim that under this two-tier licensing regime, most consumers did not purchase software licenses directly from Microsoft. Rather, they bought computers from OEMs or retailers with pre-installed software that incorporated Microsoft's offer to issue the end-

user a license agreement. The 26 plaintiffs who have appealed here are typical of those who purchased computers from OEMs or retailers with preinstalled software.

The plaintiffs allege that Microsoft's exclusionary and restrictive practices caused them injury by charging them "supra-competitive" prices for operating systems software and applications software, by denying them the benefit of new and superior technologies, and by preventing them from reselling Microsoft software products. They also claim that by integrating its Internet Explorer web browser with its operating system, Microsoft deprived them of alternative Internet search engines, degraded the performance of their computers, and made their computers more susceptible to security breaches. In short, they allege that as end-users, they paid "supra-competitive" prices for software and were deprived of the benefits of competition including, but not limited to, technological innovation, market choice, product variety, and substitutable supply. They request equitable relief, treble damages, attorneys fees, and costs.

In response to the plaintiffs' complaint, Microsoft filed a motion to dismiss plaintiffs' money-damages claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. By order dated January 12, 2001, the district court granted Microsoft's motion, relying on two distinct grounds: (1) that the plaintiffs were indirect purchasers and therefore barred from suing for overcharge damages under the doctrine of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977); and (2) that the plaintiffs lacked standing to seek recovery for injuries other than overcharges under the holding of *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519 (1983). *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702 (D. Md. 2001).

With respect to its application of *Illinois Brick*, the district court concluded that the plaintiffs did not purchase either software or EULAs directly from Microsoft, even though the computers that the plaintiffs purchased included licenses from Microsoft that had to be agreed to by the purchasers. The court noted, "Whether the consumer buys software or the EULA, the immediate economic transaction constituting the purchase occurs between the consumer and an OEM or retail seller." *Id.* at 709. The court also concluded that despite the

broad allegations of antitrust injury, the plaintiffs' money-damages claims reduced to claims for supra-competitive prices or overcharges paid by the plaintiffs *to the OEMs or retail dealers* from whom they purchased the computers, because any damage that was not measurable by the prices paid to the OEMs or retailers was "only incidentally related to the alleged anticompetitive behavior." *Id.* at 712.

As to the standing issue, the district court considered the five factors identified in *Associated General Contractors* and concluded that consideration of the last two — the existence of more direct victims and the problem of speculative injury and complexity in apportioning damages — supported its conclusion that plaintiffs lacked standing to sue for some of the injuries alleged. *Id.* at 711.

The district court certified its January 12, 2001 dismissal order for appellate review under 28 U.S.C. § 1292(b). *In re Microsoft Corp.*, 127 F. Supp. 2d at 727. We denied plaintiffs' petition for interlocutory appeal on June 27, 2001.

The district court granted Microsoft's motion to dismiss the remaining issues for equitable relief on November 29, 2004, concluding that it was "perfectly clear . . . that the plaintiffs in the consolidated amended complaint were not pursuing injunctive claims with diligence. The focus was on monetary damages." The court also concluded that Microsoft would be prejudiced and that resurrecting equitable claims at that late date would be "contrary to the public interest."

Along with granting Microsoft's motion to dismiss the plaintiffs' claims for equitable relief, the district court entered final judgment in this case on November 29, 2004, dismissing plaintiffs' complaint. Twenty-six plaintiffs are now prosecuting this appeal from the court's judgment.

II

Our review of the district court's judgment granting Microsoft's motion to dismiss under Rule 12(b)(6) is *de novo* and focuses only on the legal sufficiency of the complaint. In conducting this review, we "take the facts in the light most favorable to the plaintiff," but "we

need not accept the legal conclusions drawn from the facts," and "we need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000); *see also Dickson v. Microsoft Corp.*, 309 F.3d 193, 201-02 (4th Cir. 2002).

## III

As its principal ground for dismissing the complaint, the district court applied the "indirect-purchaser" rule established in *Illinois Brick*, which held that only direct purchasers of products affected by anti-competitive activity can seek treble damages under § 4 of the Clayton Act. Those who purchase indirectly or through intermediaries are barred from recovering for antitrust injuries. *See also Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 207 (1990).

In *Illinois Brick*, the State of Illinois sued concrete block manufacturers for engaging in a price-fixing conspiracy, in violation of § 4 of the Clayton Act and § 1 of the Sherman Act. The manufacturers were suppliers to subcontractors who installed bricks for general contractors engaged by the State of Illinois. The State claimed that the manufacturers had illegally overcharged the intermediary contractors and that the overcharge had been passed on to the State. The Supreme Court barred the State from recovering against the manufacturers, because the State, as an indirect purchaser, "should not be allowed to use a pass-on theory to recover damages from a defendant unless the defendant would be allowed to use a pass-on defense in a suit by a direct purchaser." 431 U.S. at 729. In *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), the Court had held that an antitrust violator could *not* defend itself by arguing that a direct purchaser suffered no injury because it was able to pass on illegal overcharges to indirect purchasers. *Illinois Brick* applied the same logic to offensive uses of a "pass-on" theory. Thus, the Court held that indirect purchasers could not claim to be injured because direct purchasers had passed on illegal overcharges to them. 431 U.S. at 729-30.

The Supreme Court relied on two rationales in adopting the rule. First, allowing indirect purchasers to recover damages at each level down the economic chain "would create a serious risk of multiple lia-

bility for defendants." *Illinois Brick*, 431 U.S. at 730; *see also Hanover Shoe*, 392 U.S. at 493; *UtiliCorp*, 497 U.S. at 207. Second, courts would be required to engage in highly complicated calculations to "apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge." *Illinois Brick*, 431 U.S. at 737. This would "add whole new dimensions of complexity to treble-damages suits and seriously undermine their effectiveness." *Id.* By adopting the rule barring recovery by indirect purchasers, the risk of duplicative recoveries and overcompensation for the same antitrust injuries was eliminated.

To be governed by the *Illinois Brick* rule, plaintiffs have to be (1) indirect purchasers (2) seeking recovery for illegal overcharges. "Indirect purchasers" are those purchasers "[i]n the distribution chain, [who] are not the immediate buyers from the alleged antitrust violators." *UtiliCorp*, 497 U.S. at 207.

In this case, it is apparent that the plaintiffs were indirect purchasers because they did not buy products directly from Microsoft. Rather, they purchased computers from OEMs or retailers on which Microsoft operating systems and software had been preinstalled. The plaintiffs were thus at the end of the retail distribution chain with at least one and possibly more intermediaries between them and Microsoft. The plaintiffs are also claiming damages in the form of overcharges paid to the OEMs and retailers who could in turn seek recovery for overcharges against Microsoft. Thus, the plaintiffs' claim for damages in the form of overcharges would, at first blush, appear to fall squarely within the *Illinois Brick* paradigm.

The plaintiffs do not contest the fact that they purchased computers from OEMs and retailers, on which Microsoft operating systems and applications software were preinstalled. They argue nonetheless that *Illinois Brick* does not bar their damages claims, giving four basic reasons: (1) they acquired end-user licenses that functioned as contracts directly between them and Microsoft; (2) their right under the EULA to a refund from Microsoft establishes a direct economic relationship; (3) Microsoft should be judicially estopped from asserting that it sells software to intermediaries by statements that it made in other cases; and (4) an exception allowed by *Illinois Brick* based on superseding market forces should be applied. We address these arguments in turn.

First, plaintiffs argue that because they subscribed to EULAs and Microsoft does not *sell* its software to anyone, the EULA between each plaintiff and Microsoft is the relevant economic transaction. This argument, however, fails to recognize both the role of the OEM or the retailer in the licensing chain and the economic realities of the transaction. Although Microsoft does not sell *title* to its software, it does sell licenses to use its software, and plaintiffs could have acquired licenses *directly* from Microsoft. Indeed, in this case, the district court certified a class of end-users who did purchase licenses for operating systems software directly from Microsoft. But the plaintiffs in this case acquired their licenses by purchases from OEMs and retailers, paying them, not Microsoft, for their licenses at prices set by the OEMs and retailers. Because the plaintiffs purchased their products from intermediaries and not Microsoft, they are indirect purchasers within the meaning of that term as defined in *Illinois Brick* and *Utili-Corp*, and the recoveries they would have from Microsoft would present the very problems that those cases sought to avoid.

In the same vein, the plaintiffs contend that because the EULA entitles them to a refund from Microsoft in the event that they do not subscribe to the license, the meaningful transaction is between them and Microsoft. But it does not follow from this observation that the plaintiffs were direct *purchasers* of Microsoft's licenses. While the reimbursement structure does demonstrate that Microsoft maintains a financial relationship with end-users, that relationship does not establish that plaintiffs paid Microsoft for the software licenses. Moreover, even though Microsoft might be required by the EULA to provide refunds or other reimbursements, that obligation did not give Microsoft the ability to control the retail prices set by OEMs and retailers for the sale of the license agreements. Were we to accept plaintiffs' argument, we would have to consider the very complex price adjustments within Microsoft's distribution chain that *Illinois Brick* sought to avoid. *See Illinois Brick*, 431 U.S. at 737.

Plaintiffs also seek to bind Microsoft, under the doctrine of judicial estoppel, from asserting that it sells software to OEMs or other retailers because, within the context of other legal disputes, Microsoft has denied making a "first sale" to OEMs. Although Microsoft may have argued in the past that it did not sell *title* to its software, plaintiffs have not shown that Microsoft ever denied selling OEMs the right to

charge consumers for licenses or the options to enter into licenses. As Microsoft has not relied on mutually inconsistent positions, we find no basis for applying the doctrine of judicial estoppel. *See Emergency One, Inc. v. Am. Fire Eagle Engine Co.*, 332 F.3d 264, 274 (4th Cir. 2003); *King v. Herbert J. Thomas Memorial Hosp.*, 159 F.3d 192, 196-97 (4th Cir. 1998).

Finally, plaintiffs argue that they should not be held to be indirect purchasers because of a so-called "market forces" exception referred to in *Illinois Brick*. There, the Court stated that a "situation in which market forces have been superseded and the pass-on defense might be permitted is where the direct purchaser is owned or controlled by its customer." 431 U.S. at 736 n.16. This exception, however, has been construed narrowly to apply only when the antitrust defendant has either "functional unity" with the intermediary sellers or sufficient ownership interest in or control over the intermediary sellers to set prices along the chain of distribution. *See In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 605-06 (7th Cir. 1997); *Jewish Hosp. Assoc. v. Stewart Mechanical Enterprises, Inc.*, 628 F.2d 971, 975 (6th Cir. 1980); *In re Sugar Industry Antitrust Litig.*, 579 F.2d 13, 19 (3d Cir. 1978). The plaintiffs, however, do not allege such facts. In the absence of such allegations, we cannot overlook the Supreme Court's admonition against enlarging market-based exceptions that would undermine the indirect-purchaser rule. *See UtiliCorp*, 497 U.S. at 216-17; *see also Dickson*, 309 F.3d at 214-215 (following "the Supreme Court's clear directive in *UtiliCorp United* against crafting new exceptions to the *Illinois Brick* rule").

In short, plaintiffs purchased their licenses or license-options from OEMs and retailers, paying for them at prices established by the OEMs and retailers, not by Microsoft. While the licenses they purchased from OEMs and retailers gave them financial rights against Microsoft, the economic transaction for this license was consummated with the intermediaries at prices fixed by the intermediaries. The financial rights given to end-users in the EULAs are simply not relevant to the *Illinois Brick* issue.

The plaintiffs' more serious argument for bypassing *Illinois Brick* relates to whether the damages that plaintiffs claim resulted from an illegal overcharge passed on to them by the intermediaries.

First, the plaintiffs, recognizing that they made their payments for the licenses to intermediaries, contend that the *Illinois Brick* rule does not require that consumers have made payments directly to antitrust defendants. They rely primarily on *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), in which the Supreme Court held that plaintiffs suffered antitrust injuries when their healthcare insurer implemented a boycott of psychologists and refused to reimburse the plaintiffs for payments that they made to the psychologists for services. The Court distinguished that factual circumstance from those in *Hanover Shoe* and *Illinois Brick* because, in the case before it, there was no intermediary threatening duplicative recovery. The psychologists were paid by the plaintiffs and therefore had no claim against the insurer based on its failure to reimburse. Nor did the case present difficulties in "disentangling overlapping damages claims," since McCready's "damages were fixed . . . they could be ascertained to the penny." *Id.* at 475 n.11 (internal quotation marks omitted). In this case, by contrast, the plaintiffs stand at the end of a distribution chain in which the intermediaries have independently set prices and passed on alleged overcharges. Such circumstances are decisive in distinguishing this case from *McCready* and in bringing the facts alleged within the holding of *Illinois Brick*.

The plaintiffs also contend that despite the fact that they paid intermediaries for the licenses, Microsoft caused them direct injuries by (1) suppressing competitive technologies, (2) restricting the terms of end-user licenses, and (3) degrading computer performance. They argue that these injuries were sustained by them and not by intermediaries. But as the plaintiffs themselves have argued, the effect of having competitive substitute technologies available on the market would have been to drive down the price of Microsoft's products. Indeed, the plaintiffs' theory of damages for the denial of rival products is based on the difference between what consumers paid for Microsoft software and what they would have paid in a competitive market. As the district court observed, however, the same theory could be advanced by OEMs and intermediary retailers who "could sue Microsoft alleging that they had paid too much for the products they had purchased, [and] the problems of potential multiple recoveries and apportionment of damages would recur." *In re Microsoft*, 127 F. Supp. 2d at 710.

The same logic applies to plaintiffs' claim that they suffered unique and direct injuries from restrictions placed on end-user licenses making it more difficult for them to obtain reimbursements and prohibiting them from reselling the software in a secondary or "used" software market. Licenses that encouraged consumers to obtain reimbursements and that permitted them to resell in "used" software markets would have had greater value. But that is merely another way of stating that the consumers paid too much for the more restrictive licenses. Again, the OEMs and retailers could have made this same claim. In purchasing the right to offer consumers restrictive end-user licenses, they suffered exactly the same antitrust injury.

Finally, the plaintiffs claim that Microsoft's integration of Internet Explorer and Windows caused them direct injury because it resulted in performance degradation of their computers. This claim either mirrors the assertion that Microsoft suppressed superior technologies or seeks recovery for injuries that are not antitrust injuries. If Microsoft developed inferior technology, it essentially overcharged intermediaries for the value of its products, as measured by the price it would have obtained in a competitive market. Such injury is no different in principle from the restrictions on end-user licenses and the suppression of substitute technologies. All are essentially claims for illegal overcharges passed on to consumers. And to the extent that Microsoft's software degraded the performance of plaintiffs' computers, then any such damage would not form the basis of a claim for antitrust injury but a claim for some type of product liability injury. Presumably plaintiffs could make that claim just as they could for any other product liability claim.

In short, the market structure alleged by the plaintiffs in the complaint fits easily within the *Illinois Brick* paradigm. The plaintiffs are end-users who purchased Microsoft licenses from OEMs and retailers at prices fixed by the OEMs and retailers. In these circumstances, the indirect purchaser doctrine of *Illinois Brick* applies to bar their claims.

IV

In addition to claiming injury based on the allegation that Microsoft charged supra-competitive prices — i.e., overcharges which are barred by *Illinois Brick* — plaintiffs claim, as we have just noted,

other types of injury. To repeat, they have alleged that (1) they were deprived of the benefits of competitive technology; (2) they sustained injury from restrictions imposed in the EULAs prohibiting them from reselling Microsoft software in a secondary or "used" market; and (3) their computers were degraded by the integration of the Internet Explorer web browser with the Windows operating system. As we concluded in Part II, these injuries amount to a form of overcharge passed on to the plaintiffs by OEMs and retailers and therefore were barred by *Illinois Brick*. In addition, however, the district court concluded that the plaintiffs lacked standing to assert claims for these injuries under *American General Contractors*.

Although courts sometimes blend the indirect purchaser rule of *Illinois Brick* and the requirement of § 4 standing under *American General Contractors*, the Supreme Court has explained, "[T]he question of which persons have been injured by an illegal overcharge for purposes of § 4 is analytically distinct from the question of which persons have sustained injuries too remote to give them standing to sue for damages under § 4." *Illinois Brick*, 431 U.S. at 728 n.7. To have § 4 standing, the plaintiffs must demonstrate direct antitrust-type injury, not simply any injury that was caused by an antitrust violation. "Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for injury to his business or property." *American General Contractors*, 459 U.S. at 535 (quoting *McCready*, 457 U.S. at 476-77) (internal quotation marks omitted). To determine whether a person has sustained direct antitrust-type injury to his business or property, a court must consider the five factors identified in *American General Contractors*: (1) the causal connection between an antitrust violation and harm to the plaintiffs, and whether that harm was intended, *id.* at 537; (2) whether the harm "was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws," *id.* at 538 (quoting *McCready*, 457 U.S. at 466); (3) the directness of the alleged injury, *id.* at 540; (4) "the existence of more direct victims" of the alleged antitrust injury, *id.* at 545; and (5) "problems of identifying damages and apportioning them" among those directly and indirectly harmed, *id.*

When considering the three types of injury that plaintiffs claim to have sustained directly — injuries other than supra-competitive prices

— we conclude, by applying the *American General Contractors* factors, that plaintiffs' injuries were too generalized or speculative; that some injuries were not of the type covered by the antitrust law; that there were more direct victims; and that plaintiffs' claims raise insuperable problems in measuring and allocating damages. Some of these conclusions overlap those reached in connection with analyzing plaintiffs' damages under the doctrine of *Illinois Brick*, but they also independently support our holding that plaintiffs lacked standing to assert claims for some of the injuries alleged.

First, with respect to plaintiffs' claims that Microsoft deprived consumers of competitive technology, we agree with the conclusions reached by the district court. The court observed, "It would be entirely speculative and beyond the competence of a judicial proceeding to create in hindsight a technological universe that never came into existence." *In re Microsoft*, 127 F. Supp. 2d at 711. The court continued, "It would be even more speculative to determine the relevant benefits and detriments that non-Microsoft products would have brought to the market and the relative monetary value . . . to a diffuse population of end users." *Id.* While plaintiffs assert that they should be given discovery with respect to these issues, it is readily apparent that discovery would not change or inform the nature of the alleged injuries. As the district court stated,

> The underlying reason that plaintiffs lack standing is that, to the extent they are seeking damages . . . for the denial of the benefit of technologically superior products, it is merely coincidental that they purchased Microsoft products at all. They occupy a position no different from any other end user of computer products who never purchased any Microsoft software or EULAs.

*Id.* At bottom, the harms that the plaintiffs have alleged with respect to the loss of competitive technologies are so diffuse that they could not possibly be adequately measured. The problem is not one of discovery and specific evidence, but of the nature of the injury claimed. Where the purported injuries amount to generalized or abstract societal harms, the plaintiffs cannot claim that they, as distinct from others in society, were specifically injured in their business or property by the alleged antitrust violation, as required by § 4. *See Highland*

*Supply Corp. v. Reynolds Metals Co.*, 327 F.2d 725, 732 (8th Cir. 1964) ("Damages claimed in a private antitrust suit must be different from those suffered by the general public — i.e., they must be special to the claimant").

With respect to plaintiffs' alleged injury from Microsoft's restrictions on end-users in the EULAs, the plaintiffs lack standing because there are more direct victims — i.e., the retailers and OEMs — and because it is too costly for courts to discern the allocation of such damages. These attributes of this injury claimed by plaintiffs are the same as those supporting application of the indirect-purchaser rule of *Illinois Brick*, which has been discussed above.

Finally, with respect to plaintiffs' allegation that Microsoft degraded the performance of their personal computers, we have already concluded that insofar as this injury is a claim for an overcharge, it is barred under *Illinois Brick*. But the plaintiffs also claim that the integration of Windows and the Internet Explorer web browser resulted in specific harms to their computers including "loss of speed and memory . . . loss of operating system stability and increased susceptibility to viruses or security breaches." To the extent that these claims are for actual injury to plaintiffs' computers, the plaintiffs' claims amount to claims for defective products. This type of injury is simply not a type for which plaintiffs can recover under the antitrust law. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Rather, it sounds more in the nature of injury from a breach of warranty or other product liability. And plaintiffs do not assert that Microsoft intended to cause this harm to plaintiffs' computers or that Microsoft's purpose for inflicting this injury was aimed at lessening competition. As the district court observed, "the degradation of computer performance alleged by plaintiffs is only incidentally related to the alleged anti-competitive behavior." *In re Microsoft*, 127 F. Supp. 2d at 712.

In short, we agree with the district court that in addition to the barrier imposed by the doctrine of *Illinois Brick*, plaintiffs have failed to demonstrate that they have sustained direct antitrust-type injury, as required by § 4 of the Clayton Act and *Associated General Contractors*.

V

Finally, we address whether the district court abused its discretion in dismissing plaintiffs' claims for injunctive relief under the doctrine of laches. *See White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990) ("[T]he equitable balancing of a plaintiff's delay with prejudice to a defendant is primarily left *to the sound discretion of the trial court, and we may not reverse unless it is so clearly wrong as to amount to an abuse of discretion*") (internal quotation marks omitted) (emphasis added). In dismissing the plaintiffs' claims for equitable relief, the district court concluded that the plaintiffs failed to pursue their injunctive claims with diligence and that their failure prejudiced Microsoft. *See Giddens v. Isbrandtsen Co.*, 355 F.2d 125, 127 (4th Cir. 1966) (noting that laches may be applied when a plaintiff fails to pursue his claim with diligence, causing prejudice to the opposing party).

The plaintiffs argue that they did not pursue their equitable claims because they were involved in class action settlement proceedings. They suggest that it would have made no sense to press their claims until those proceedings were resolved. In addition, the plaintiffs assert that Microsoft had notice of the nature of their claims for injunctive relief and suffered no prejudice in the form of "unfair surprise or inability to prepare its defense."

In response, Microsoft argues that plaintiffs filed only a generalized claim requesting injunctive relief in 2000 but waited more than four years before articulating the nature of the injunctive relief that they were seeking. Microsoft contends that this delay made it impossible for it to coordinate any consideration of remedies with the litigation in the United States' action against Microsoft then pending before Judge Kollar-Kotelly in the District of Columbia District Court. Microsoft argues that if the equitable claims had not been dismissed, a second round of litigation over the market effects of the proposed consent decree in the United States' action would have been required.

Accepting Microsoft's arguments, the district court stated that it was "perfectly clear . . . that the plaintiffs in the consolidated amended complaint were not pursuing injunctive claims with diligence. The focus was on monetary damages." The court also relied

on the fact that the inability to coordinate with the United States' action caused prejudice because the simultaneous proceedings would have "reshape[d] the competitive landscape." Finally, the court noted that despite years of litigation, the plaintiffs had only recently specified the nature of their request for equitable relief and that they were using the initial "vague claim" for equitable relief as "a vessel for, essentially, asserting new claims." Permitting that result would, in the district court's judgment, be "contrary to the public interest."

In the circumstances of this case, we conclude that the district court did not abuse its discretion in applying the doctrine of laches to dismiss plaintiffs' equitable claims.

\* \* \*

For the reasons given, the November 29, 2004 judgment of the district court dismissing appellants' complaint is

*AFFIRMED*.