PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

SHERIF PHILIPS, M.D.,

                *Plaintiff-Appellant,*

        v.

PITT COUNTY MEMORIAL HOSPITAL;
PAUL BOLIN, M.D.; RALPH E.
WHATLEY, M.D.,

              *Defendants-Appellees.*

No. 07-1986

SHERIF PHILIPS, M.D.,

                *Plaintiff-Appellant,*

        v.

PITT COUNTY MEMORIAL HOSPITAL;
SANJAY PATEL, M.D.; PAUL BOLIN,
M.D.; RALPH E. WHATLEY, M.D.;
CYNTHIA BROWN, M.D.,

              *Defendants-Appellees.*

No. 07-1996

Appeals from the United States District Court
for the Eastern District of North Carolina, at Greenville.
James C. Fox, Senior District Judge.
(4:07-cv-00049-F; 4:05-cv-00097-F)

Argued: October 29, 2008

Decided: July 13, 2009

Before WILLIAMS, Chief Judge,[1] MICHAEL, Circuit Judge, and John T. COPENHAVER, Jr., United States District Judge for the Southern District of West Virginia, sitting by designation.

---

Affirmed by published opinion. Judge Copenhaver wrote the opinion, in which Judge Michael joined.

---

## COUNSEL

**ARGUED:** Karin Marshall Zaner, KANE, RUSSELL, COLEMAN & LOGAN, Dallas, Texas, for Appellant. Charles David Creech, HARRIS, CREECH, WARD & BLACKERBY, New Bern, North Carolina, for Appellees. **ON BRIEF:** Lisa M. Schreiner, Deborah N. Meyer, MEYER LAW OFFICES, P.A., Cary, North Carolina, for Appellant. W. Gregory Merritt, Jay C. Salsman, HARRIS, CREECH, WARD & BLACKERBY, New Bern, North Carolina, for Appellees.

---

## OPINION

COPENHAVER, District Judge:

Dr. Sherif A. Philips instituted two civil actions challenging the suspension of his practice privileges at Pitt County Memorial Hospital ("the Hospital"). In addition to supplemental state law claims, he alleged violations of 42 U.S.C. § 1983 based upon putative infringements of his Fourteenth Amend-

---

[1] Chief Judge Williams heard oral argument in this case but did not participate in the decision. The decision is filed by a quorum of the panel pursuant to 28 U.S.C. § 46(d).

ment due process rights surrounding the proceedings that resulted in his suspension. He contends that Pitt County Memorial Hospital, Inc. ("PCMHI"), a nonprofit corporation, is a state actor.

The defendants moved to dismiss both actions. They contended principally that Dr. Philips could not show they acted under color of state law. The district court agreed and Dr. Philips appeals. We affirm.

I.

From 1953 until June 1998, Pitt County owned all of the property representing the Hospital, which it apparently leased to PCMHI, a non-profit formed in 1953 under the general nonprofit incorporation laws of North Carolina. On June 1, 1998, at a time when PCMHI was operating the Hospital under a long term lease from Pitt County dated December 1, 1989, Pitt County and PCMHI entered into an "AGREEMENT TO CHANGE STATUS OF PITT COUNTY MEMORIAL HOSPITAL" ("Agreement"). (JA 47).

The Agreement was designed "to change the status of . . . . [Pitt County Memorial Hospital] from a Public Hospital to a Private Not For Profit Hospital" pursuant to the Municipal Hospital Act, North Carolina General Statutes § 131E-8 ("Act"). (*Id.*) Accompanying the change over was the filing by PCMHI with the North Carolina Secretary of State on September 18, 1998, of Restated Articles of Incorporation ("Restated Articles"), submitted for the purpose, in part, of reflecting PCMHI's "reorganization from an agency of Pitt County to a private not-for-profit corporation."[2]

---

[2](Restated Articles at 1 (Sept. 18, 1998), *available at*, http://www.secretary.state.nc.us/corporations/Filings.aspx?PItemId=5058825. The Restated Articles do not appear in the record but are freely available from the North Carolina Secretary of State.

The change was accomplished by the sale of the Hospital to PCMHI, at a price of $30 million spread over two years. The Agreement includes further terms indicative of some measure of retained control by Pitt County over its former agency, PCMHI:

> PCMHI must make annual payments to Pitt County "in lieu of taxes . . . ." (JA 48); and it must continue annually to contribute $452,000 toward reimbursing Pitt County for Medicaid payments, with annual increases to account for inflation.

> PCMHI cannot sell or encumber the Hospital real property without Pitt County's prior written approval; and PCMHI's "Permitted Indebtedness" is limited as set forth in an attachment to the Agreement.

> If the Hospital is sold or merged, with Pitt County's required consent, all net proceeds go to Pitt County.

> Pitt County approval is required for any annual asset disposition exceeding a stated benchmark.

> PCMHI is prohibited from allowing a substantial portion of the Hospital system to be managed by an entity not controlled by PCMHI.

> PCMHI must continue an existing school nurse program for the Pitt County Board of Education.

> PCMHI must continue to serve as the primary teaching hospital of East Carolina University School of Medicine and maintain the Affiliation Agreement between the medical school, Pitt County and PCMHI.

> PCMHI is to comply with the North Carolina Open Meetings Law; and the Commissioners of Pitt

County are to receive notice of, and access to, all meetings of the PCMHI Board of Trustees, including closed sessions.

PCMHI is governed by a 20-member Board of Trustees, with Pitt County appointing 11 members, and the remaining 9 members appointed by the Board of Governors of the University of North Carolina. These two governmental entities can remove their respective appointees only "for cause."[3] (*Id.*)

Noteworthy are the Agreement's automatic reversionary provisions under which all Hospital assets, real and personal, revert to Pitt County if PCMHI fails in any of the following respects:

Fails to make payments to Pitt County in accordance with the Agreement;

Fails to maintain a level of indigent care consistent with historical practice and expenditures;

Loses its accreditation;

Dissolves without a successor nonprofit corporation approved by Pitt County.

The contemplated reversion would divest PCMHI of all ownership rights in the real and personal property of which the

---

[3]The term "cause" is defined in the Restated Articles as

mental incompetency, bad faith, breach of fiduciary responsibility, a conflict of interest in violation of . . . bylaw or policies, conviction of . . . a felony or any crime involving moral turpitude, or absenteeism . . . without excuse . . . from more than . . . 25% . . . of the . . . meetings during [a] twelve-month period . . . .

(Restated Articles at 7).

Hospital is composed.[4] It is noted that reverter is one of the required provisions for a nonprofit corporation receiving ownership from a municipality of a hospital facility under North Carolina's Municipal Hospital Act.[5]

In dismissing these actions, the district court observed:

> [T]he . . . Agreement expresses an intent to create a private hospital and does not provide Pitt County officials with control of the administration of hospital services or personnel procedures. Pitt County officials are not involved in PCMH's day-to-day operation and Plaintiff has not alleged that Pitt County officials, or any Government actors, were involved in the suspension of his hospital privileges.

*Philips v. Pitt County Mem'l Hosp., Inc.*, 503 F. Supp.2d 776, 782 (E.D.N.C. 2007).

The district court relied significantly upon our decision in *Modaber v. Culpeper Memorial Hospital, Inc.*, 674 F.2d 1023 (4th Cir. 1982), which provides that

> [a] state becomes responsible for a private party's act if the private party acts (1) in an exclusively state capacity, (2) for the state's direct benefit, or (3) at the state's specific behest. It acts in an exclusively state capacity when it "exercises powers traditionally

---

[4]Discretionary reversion was authorized under some circumstances. For example, ownership and control could vest anew in Pitt County if PCMHI violated the "GOVERNANCE" provisions in the Agreement. These provisions (1) prohibited PCMHI from amending its articles or bylaws relating to the appointment or composition of the Board without the prior approval of Pitt County, and (2) required the Board to approve certain actions taken by an 85% supermajority.

[5]A municipality is defined by the Municipal Hospital Act as "any county, city, or other political subdivision of th[e] State, or any hospital district created under Part C of this Article." *Id.* § 131E-6(5).

exclusively reserved to the state(,)" for the state's direct benefit when it shares the rewards and responsibilities of a private venture with the state, and at the state's specific behest when it does a particular act which the state has directed or encouraged.

*Id.* at 1025.

## II.

### A.   Standard of Review

We review *de novo* a district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 655 (4th Cir. 2004). In considering such a motion, we accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff. *Mylan Labs.*, 7 F.3d at 1134. In counterbalance to this plaintiff-centered analysis, we recently stated:

> To survive a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level" and have "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1965, 1974, 167 L.Ed.2d 929 (2007). Moreover, the court "need not accept the [plaintiff's] legal conclusions drawn from the facts," nor need it "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006) (internal quotation marks omitted).

*Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009).

In reviewing a Rule 12(b)(6) dismissal, we may properly take judicial notice of matters of public record. *Hall v. Vir-*

*ginia*, 385 F.3d 421, 424 (4th Cir. 2004) (noting it was proper during Rule 12(b)(6) review to consider "publicly available [statistics] on the official redistricting website of the Virginia Division of Legislative Services.") (citing *Papasan v. Allain*, 478 U.S. 265, 268 n. 1, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) ("Although this case comes to us on a motion to dismiss . . . , we are not precluded in our review of the complaint from taking notice of items in the public record . . . ."). We may also consider documents attached to the complaint, *see* Fed.R.Civ.P. 10(c), as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic. *See Blankenship v. Manchin*, 471 F.3d 523, 526 n. 1 (4th Cir. 2006).

## B.    Analysis

Title 42 U.S.C. § 1983 is a federal statutory remedy available to those deprived of rights secured to them by the Constitution and, in a more sharply limited way, the statutory laws of the United States. Section 1983 provides pertinently as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

One alleging a violation of section 1983 must prove that the charged state actor (1) deprived plaintiff of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was performed under color of the referenced

sources of state law found in the statute. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970); *Mentavlos v. Anderson*, 249 F.3d 301, 310 (4th Cir. 2001).

The statutory color-of-law prerequisite is synonymous with the more familiar state-action requirement—and the analysis for each is identical. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982) (stating "[I]t is clear that in a § 1983 action brought against a state official, the statutory requirement of action 'under color of state law' and the 'state action' requirement of the Fourteenth Amendment are identical."); *United States v. Price*, 383 U.S. 787, 794, n. 7 (1966); *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 658 (4th Cir. 1998); *Moore v. Williamsburg Reg'l Hosp.*, 560 F.3d 166, 178 (4th Cir. 2009) ("The same analysis applies to whether an action was taken 'under color of state law' as required by § 1983 and whether the action was state action."); *Haavistola v. Cmty. Fire Co.*, 6 F.3d 211, 215 (4th Cir. 1993).

It has been observed that "'merely private conduct, no matter how discriminatory or wrongful[,]'" fails to qualify as state action. *See Mentavlos*, 249 F.3d at 301 (quoting *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999)) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982)). This is so, in part, to "'preserve[ ] an area of individual freedom by limiting the reach of federal law' and 'avoid[ing] impos[ition] [up]on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed.'" *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619 (1991) (quoting *Lugar*, 457 U.S. at 936-37). In sum, "'private activity will generally not be deemed "state action" unless the state has so dominated such activity as to convert it to state action: "Mere approval of or acquiescence in the initiatives of a private party" is insufficient.'" *Wahi*, 562 F.3d at 616 (quoting *DeBauche v. Trani*, 191 F.3d 499, 507 (4th Cir. 1999)).

Nevertheless, there are infrequently arising circumstances under which the actions of an ostensibly private party will be

deemed to satisfy the color-of-law requirement. We recently summarized when that sort of attribution was appropriate, with a concomitant observation of why it was the exception rather than the rule:

> Under th[e state-action or color-of-law] doctrine, we "insist [ ]" as a prerequisite to liability "that the *conduct* allegedly *causing the deprivation* of a federal right *be fairly attributable to the State*." By doing so, we maintain the Bill of Rights as a shield that protects private citizens from the excesses of government, rather than a sword that they may use to impose liability upon one another.

*Holly v. Scott*, 434 F.3d 287, 292 (4th Cir. 2006) (emphasis added); *see also Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295-96 (2001).

Commentators and appellate courts, including our own, have attempted to categorize situations that justify the state-action label.[6] *See*, *e.g.*, *Moore*, 560 F.3d at 179 (noting "a private entity's action can constitute state action if '"there is a sufficiently *close nexus* between the State and the challenged action of the regulated entity that the action of the latter may fairly be treated as that of the State itself,"' but 'state involvement without state responsibility cannot establish this nexus'")(emphasis added)(citation omitted); *DeBauche*, 191 F.3d at 507 (observing, based upon *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961), that a "*symbiotic* relationship" may establish state action where profits earned by a private restaurant practicing discrimination "not only

---

[6]One commentator suggests, based upon a review of Supreme Court precedent, that private parties may theoretically be sued under § 1983 using several theories, labeled as "symbiotic relationship; public function; close or joint nexus; joint participation; and pervasive entwinement." Federal Judicial Center, Martin A. Schwartz & Kathryn R. Urbonya, Section 1983 Litigation 88 (2nd ed. 2008).

contribute[d] to, but also [were] indispensable elements in, the financial success of a governmental agency" leasing space to the restaurant) (emphasis added); *Andrews v. Fed. Home Loan Bank of Atlanta*, 998 F.2d 214, 218 (4th Cir. 1993) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974)) (noting the "'*public function*' theory" recognizes the existence of "narrow circumstances" where state action arises from the "'exercise by a private entity of powers traditionally exclusively reserved to the State'") (emphasis added); *see also*, *e.g.*, 1 Ivan E. Bodensteiner and Rosalie Berger Levinson, State and Local Government Civil Rights Liability § 4 (2009)(footnotes omitted).

In the end, however, "there is 'no specific formula' for determining whether state action is present. . . . 'What is fairly attributable [to the state] is a matter of normative judgment, and the criteria lack rigid simplicity.'" *Holly*, 434 F.3d at 292 (quoting, in part, *Brentwood*, 531 U.S. at 295).

Dr. Philips appears to rely upon the close nexus analysis in asserting the presence of state action. (*See*, *e.g.*, Ap'ant's Br. at 2 ("Dr. Philips's complaint pleaded a sufficiently close nexus between the government and Defendants/Appellees' decision to suspend his privileges."); *id.* ("In evaluating the sufficiency of Dr. Philips's complaint, the district court was required to . . . determine whether Dr. Philips pleaded a sufficiently close nexus between the state and PCMH . . . ."); *id.* at 19, 20, 21, 26). Labels aside, however, the thrust of Dr. Philips' argument is, essentially, that inasmuch as the Board of Trustees was appointed exclusively by state actors, and the Board terminated his privileges, the Board should be deemed a state actor.

In *Moore*, a physician instituted an action against Williamsburg Regional Hospital ("WRH"), a private non-profit hospital, and its agents for suspending his staff privileges. As noted in *Moore*:

Previously, the hospital was Williamsburg County Memorial Hospital and was organized as a tax exempt Regional Health Services District under S.C. Code § 44-7-2010 *et seq.* It became a private hospital on October 1, 2001, when the assets of Williamsburg County Memorial Hospital Public Service District were transferred to defendant corporation WRH in accordance with South Carolina law. *See* S.C. Code § 4-9-82.

*Id.* at 179 (footnote omitted).[7]

The physician asserted satisfaction of the state action requirement based upon the fact that the hospital Board of Directors that terminated him was composed of individuals nominated by the county delegates to the state legislature and ratified by the Governor, with two county representatives serving as *ex-officio* nonvoting members of the Board, and because WRH receives state and county funds and funds through Medicaid and the South Carolina State Plan under Title XIX of the Social Security Act as a public hospital.

Despite the government-controlled appointment process, the court, in an opinion authored by Judge Wilkinson, concluded more was necessary for state action:

Plaintiff contends . . . that this case is distinguishable from *Modaber* because government funding is not the only factor that establishes a nexus between

---

[7]South Carolina Code section 4-9-82(A) provides as follows:

(A) The governing body of any hospital public service district is authorized to transfer its assets and properties for the delivery of medical services *upon assumption by the transferee of the responsibilities of the district for the delivery of medical services as set forth in the legislation creating the hospital public service district*.

S.C. Code Ann. § 4-9-82 (emphasis added).

> WRH's action and the state. Here, in addition, the Board of Directors is nominated by the county delegates to the state legislature and approved by the Governor, and two government officials (the county supervisor and a county representative) serve as *ex-officio* members of the Board.
>
> These additional facts, however, do not make the state responsible for WRH's privileging decisions. The Governor's involvement with the Board ends after he approves the members, and plaintiff has not presented any evidence that the Governor has used his authority to influence privileging decisions. The county representatives may attend the board meetings, but they do not have voting rights and were not present for the consideration of plaintiff's suspension. In fact, the members of the Board who voted were three local bankers and a school principal. Therefore, it cannot be said that the Governor or the county representatives were responsible for WRH's decision to uphold plaintiff's suspension. As in *Freilich[ v. Upper Chesapeake Health, Inc.,* 313 F.3d 205, 214 (4th Cir. 2002)], "the State plays no role whatsoever in the actual decision as to whether or not to terminate or reappoint any particular physician." 313 F.3d at 214 n.3; . . . . Therefore, WRH's suspension of plaintiff's privileges is not state action.

*Moore*, 560 F.3d at 179-80 (citation omitted); *see also*, *e.g.*, *Patrick v. Floyd Med. Ctr.*, 201 F.3d 1313, 1316 (11th Cir. 2000); *Crowder v. Conlan*, 740 F.2d 447, 453 (6th Cir. 1984).[8]

---

[8]Like the district court, we do not perceive the three-part inquiry in *Modaber* to assist Dr. Philips' state action argument. First, healthcare services are not understood to constitute traditional powers reserved to the state. Second, Dr. Philips does not allege that Pitt County shares with PCMHI in the rewards and responsibilities emanating from the Hospital's operation. Third, Dr. Philips likewise does not allege that the termination of his privileges by PCMHI was at Pitt County's behest.

Although Pitt County and another state actor exercise exclusive authority to appoint members of the Board, Dr. Philips' complaints nowhere allege that the appointing governmental entities played any role in the specific decision to terminate his privileges. Moreover, once appointed, a member of the Board is protected from undue influence by the appointing authority in that a Board member may only be removed for cause, which, as earlier noted, is defined and limited.

Pitt County did retain a measure of control over a number of matters at PCMHI. That control is largely embodied in the reverter provision which helps assure that PCMHI meets Pitt County's objectives of care for the indigent, payment to the County of specified monetary obligations, and the continuation of the Hospital. PCMHI, however, remains free to manage the Hospital and run the entirety of its operations.

Indeed, there is no allegation of Pitt County's involvement in the decisions that led to Dr. Philip's alleged deprivations. The decision in *Moore* suggests no basis for an exception here to the general rule that the governmental entity must play a role in the specific decision that led to the deprivations complained of by an aggrieved person. *See*, *e.g.*, *Pariser v. Christian Health Care Sys., Inc.*, 816 F.2d 1248, 1252 (8th Cir. 1987) ("Here, Pariser's complaint identified no nexus between the various forms of government involvement with the hospital that it catalogued and the hospital's decision to suspend Pariser's privileges, and therefore its allegations, even when taken to be true, did not establish state action.").

Dr. Philips makes passing reference to labels, besides close nexus, appearing in state action jurisprudence, such as "entwine[ment,]" "intertwine[ment,]" and "joint participation." (*See, e.g.*, App'ant's Br. at 20, 21, 23, 25). Regardless of the category referenced, *Brentwood* teaches that the totality of the circumstances in this setting is determinative and that all roads lead back to a finding of state action "if, though only if,

there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may fairly be treated as that of the State itself.'" *Id.* at 295 (citation omitted). Emphasizing the same point a different way, the majority opinion stated that "[t]he judicial obligation is . . . to assure that constitutional standards are invoked 'when it can be said that the State is *responsible* for the *specific conduct* of which the plaintiff complains . . . .'" *Id.* at 295 (citation omitted) (emphasis in part original and added).

Close nexus or "pervasive entwinement" *id.* at 298, was present in *Brentwood*. In that case, a voluntary statewide association of schools, incorporated to regulate interscholastic athletic competition among its members, drew its membership from 290 public and 55 private schools. In *Brentwood*, unlike PCMHI and its Board of Trustees in this action, the association was "not an organization of natural persons acting on their own;" rather it was an organization "of schools, and of public schools to the extent of 84% of the total." *Id.* Further, each public school was represented by its principal or a faculty member who in turn voted to select the association's governing council and board composed of principals and superintendents, all of whom the Court viewed as acting within the scope of their official duties as public school employees. *Id.* at 298-300. Those two factors played a significant role in the conclusion that "[t]he nominally private character of the [a]ssociation [wa]s overborne by the pervasive entwinement of public institutions and public officials in its composition and workings . . . ." *Id.* at 298.

Such is not the case here where there is no allegation that the members of the Board of Trustees are employees of, or controlled in the ordinary course of their decision making by, Pitt County. Instead, the Board of Trustees is at the helm of a private, non-profit organization, with Pitt County retaining enough control to assure the Hospital's critical healthcare mission is continued indefinitely, with the receipt of some state and federal funds, but without concern as to the day-to-

day operation of the facility. Based upon the foregoing discussion, the district court did not err in concluding at the pleading stage that state action was absent.

The parties have not cited our decision many years ago in *Eaton v. Grubbs*, 329 F.2d 710 (4th Cir. 1964), perhaps because this area of the law has undergone a transformation in many respects since 1964.[9] In *Eaton*, three African-American physicians and two of their patients instituted a class action to enjoin the James Walker Memorial Hospital ("JWMH") and its administrator from continuing certain racially discriminatory practices.

As outlined in *Eaton*, JWMH was chartered as a corporation. Under the chartering act, it was run by a self-perpetuating board initially elected by the city and county. The city and county donated to JWMH a new hospital building and the land upon which it stood. The conveyance was restricted to use and maintenance as a hospital for the benefit of the city and county with a reverter, as here, to those governmental units in the event of abandonment or a use inconsistent with the restriction. The city and county also regularly

---

[9]It is worth noting that the decision in *Eaton* came as a result of a broad reading of the then-recent decision in *Burton*. The decision in *DeBauche* observed that, "[i]n its more recent discussion of the subject, the Supreme Court articulates the numerous limits to . . . [*Burton*], noting that . . . [the decision] . . . 'was one of our early cases dealing with "state action" . . . and later cases have refined the vague "joint participation" test embodied in that case.'" *DeBauche*, 191 F.3d at 507 (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 57 (1999)). In *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982), a decision postdating *Burton*, the Supreme Court rejected a state-action finding despite the fact that the state and a private school were in a mutually beneficial relationship. Lacking was any showing that the governmental entity derived any benefit from the alleged deprivation, namely, the termination of school personnel. The Supreme Court stressed that in *Burton* the governmental entity "profited from the restaurant's discriminatory conduct." *Id.* at 843. There is no allegation that Pitt County so benefited here from the withdrawal of Dr. Philips' privileges.

appropriated money for the hospital's operation, including contributing a majority of the funds necessary for a new wing.

Of particular significance also was that JWMH was granted the power of eminent domain. It had exercised that power by filing a petition to condemn land for use in connection with a state-financed addition to the hospital facilities. That petition alleged the hospital was "a municipal corporation, a public body." *Id.* at 713. The New Hanover County Court, in granting the petition, described the institution as "a public body, a body corporate and politic." *Id.* After noting, under North Carolina law, that the power of eminent domain is governmental in nature, it was recognized in *Eaton* that JWMH was a body exercising a segment of sovereign authority.

Under these circumstances, it was concluded as follows:

> It is not suggested that each of the enumerated factors has independent potency to invoke the constitutional requirement. It is enough for present purposes to hold, as we do, that the record in its entirety leads to the conclusion that the hospital is performing the state's function and is the chosen instrument of the state. Under our constitutional commitment the James Walker Hospital is therefore bound by the provisions of the Fourteenth Amendment to refrain from the discrimination alleged in the complaint.

*Id.* at 715.

PCMHI does not possess the power of eminent domain. Nor is it aptly described either as a municipal corporation or as "a public body, a body corporate and politic." The absence of these attributes of sovereignty distinguish the comprehensive bundle of state-related characteristics in *Eaton* from those present here.

III.

As an alternate ground, Dr. Philips has made reference to *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995). In *Lebron*, the National Railroad Passenger Corporation ("Amtrak") was deemed part of the federal government for First Amendment purposes rather than the private entity that Congress explicitly endeavored to create. *Lebron*, 513 U.S. at 400 ("We hold that where, as here, the Government [1] creates a corporation by special law, [2] for the furtherance of governmental objectives, and [3] retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment.").

The district court observed that "PCMH[I] was not created by special statute." *Id.* at 13. Dr. Philips does not appear to contend otherwise, inasmuch as he cites *Lebron* but once in his briefing, and he does not point us to any allegation in the complaint in satisfaction of the special law requirement.

It is plain enough that PCMHI was not created by special law. Rather, it was created in 1953, presumably at the instance of Pitt County, under the general nonprofit incorporation statutes of North Carolina. In 1998, PCMHI filed the Restated Articles in order to receive conveyance of the Hospital from Pitt County under the general statute of North Carolina known as the Municipal Hospital Act. Accordingly, the *Lebron* test is not met.

IV.

For the foregoing reasons, we affirm the district court's judgment.

*AFFIRMED*