**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 12-2513**

---

UNITED STATES ex rel. JON H. OBERG,

       Plaintiff - Appellant,

    v.

PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY; VERMONT STUDENT ASSISTANCE CORPORATION; ARKANSAS STUDENT LOAN AUTHORITY,

       Defendants - Appellees,

    and

NELNET, INC.; SLM CORPORATION; PANHANDLE PLAINS HIGHER EDUCATION AUTHORITY; BRAZOS GROUP; EDUCATION LOANS INC/SD; SOUTHWEST STUDENT SERVICES CORPORATION; BRAZOS HIGHER EDUCATION SERVICE CORPORATION; BRAZOS HIGHER EDUCATION AUTHORITY, INC.; NELNET EDUCATION LOAN FUNDING, INC.; PANHANDLE-PLAINS MANAGEMENT AND SERVICING CORPORATION; STUDENT LOAN FINANCE CORPORATION,

       Defendants.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, Senior District Judge. (1:07-cv-00960-CMH-JFA)

---

Argued: September 19, 2013       Decided: March 13, 2014

---

Before TRAXLER, Chief Judge, and MOTZ and KEENAN, Circuit Judges.

---

Affirmed in part, vacated in part, and remanded by published opinion. Judge Motz wrote the opinion, in which Judge Keenan joined. Chief Judge Traxler wrote a separate opinion concurring in the judgment in part and dissenting in part.

———————————

**ARGUED:** Bert Walter Rein, WILEY REIN, LLP, Washington, D.C., for Appellant. Daniel B. Huyett, STEVENS & LEE, Reading, Pennsylvania; John Stone West, TROUTMAN SANDERS, LLP, Richmond, Virginia; N. Thomas Connally, III, HOGAN LOVELLS US LLP, McLean, Virginia, for Appellees. **ON BRIEF:** Michael L. Sturm, Christopher M. Mills, Brendan J. Morrissey, WILEY REIN, LLP, Washington, D.C., for Appellant. Thomas L. Appler, WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP, McLean, Virginia, for Appellee Kentucky Higher Education Student Loan Corporation. Megan C. Rahman, TROUTMAN SANDERS LLP, Richmond, Virginia, for Appellee Vermont Student Assistance Corporation. Thomas M. Trucksess, HOGAN LOVELLS US LLP, McLean, Virginia; Dustin McDaniel, Arkansas Attorney General, Dennis R. Hansen, Deputy Attorney General, Mark N. Ohrenberger, Assistant Attorney General, OFFICE OF THE ARKANSAS ATTORNEY GENERAL, Little Rock, Arkansas, for Appellee Arkansas Student Loan Authority. Neil C. Schur, STEVENS & LEE, P.C., Philadelphia, Pennsylvania; Jill M. DeGraffenreid, McLean, Virginia, Joseph P. Esposito, HUNTON & WILLIAMS LLP, Washington, D.C., for Appellee Pennsylvania Higher Education Assistance Agency.

———————————

DIANA GRIBBON MOTZ, Circuit Judge:

This appeal returns to us after remand to the district court. Dr. Jon Oberg, as relator for the United States, brought this action against certain student loan corporations, alleging that they defrauded the Department of Education and so violated the False Claims Act ("FCA" or "the Act"), 31 U.S.C. §§ 3729 et seq. (2006). The district court initially dismissed the complaint in its entirety. When Dr. Oberg appealed, we held that the court had not employed the proper legal framework -- the arm-of-the-state analysis -- in reaching its conclusion and thus vacated its judgment and remanded the case. See U.S. ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp., 681 F.3d 575, 579-81 (4th Cir. 2012) ("Oberg I"). After applying the arm-of-the-state analysis on remand, the district court again concluded that all of the student loan corporations constituted state agencies not subject to suit under the Act and so again granted their motions to dismiss. For the reasons that follow, we affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

I.

On behalf of the United States, Dr. Oberg brought this action against the Pennsylvania Higher Education Assistance Agency, the Vermont Student Assistance Corporation, and the

3

Arkansas Student Loan Authority (collectively "appellees"). Appellees are corporate entities established by their respective states to improve access to higher education by originating, financing, and guaranteeing student loans.[1]

Dr. Oberg alleges that appellees defrauded the Department of Education by submitting false claims for Special Allowance Payments ("SAP"), a generous federal student loan interest subsidy. According to Dr. Oberg, appellees engaged in noneconomic sham transactions to inflate their loan portfolios eligible for SAP, and the Department of Education overpaid hundreds of millions of dollars to appellees as a result of the scheme. Dr. Oberg alleges that appellees violated the FCA when they knowingly submitted these false SAP claims.

The FCA provides a cause of action against "any person" who engages in certain fraudulent conduct, including "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval" to an officer, employee, or agent of the United States. 31 U.S.C. § 3729(a)(1)(A). The Act does not define the term "person." In Vermont Agency of Natural Resources v. United States, ex rel.

---

[1] Dr. Oberg also sued other defendants not parties to this appeal. Among those defendants was another student loan corporation, the Kentucky Higher Education Student Loan Corporation, which reached a settlement with Dr. Oberg shortly before the most recent appeal.

Stevens, 529 U.S. 765, 787-88 (2000), the Supreme Court held that a state or state agency does not constitute a "person" subject to liability under the Act.  But the Court also noted that corporations, by contrast, are "presumptively covered by the term 'person.'"  Id. at 782 (emphasis in original).  And three years later, the Court applied the latter presumption and held that municipal corporations like counties are 'persons' subject to suit under the FCA.  See Cook Cnty. v. U.S. ex rel. Chandler, 538 U.S. 119, 122 (2003).

Accordingly, a court must walk a careful line between two competing presumptions to determine if a state-created corporation is "truly subject to sufficient state control to render [it] a part of the state, and not a 'person,' for FCA purposes."  Oberg I, 681 F.3d at 579.[2]  In the prior appeal, we held that the appropriate legal framework for this delicate inquiry is the arm-of-the-state analysis used in the Eleventh Amendment context.  Id. at 579-80.  Because the district court had not undertaken this analysis, we vacated its judgment and

_____

[2] Dr. Oberg insists that only one presumption applies:  that all corporate entities -- regardless of their affiliation with a state -- must overcome a "presumption of 'personhood.'" Appellant's Br. 15.  The dissent seems to agree.  See Dissent. Op. at 34.  But this assertion ignores the Supreme Court's clear instruction that in the context of corporations created by and sponsored by a state, competing presumptions are at play.  See Stevens, 529 U.S. at 782 (observing that "the presumption with regard to corporations is just the opposite of the one governing [state entities]").

5

remanded the case to the district court for application of the proper legal framework. Id. at 581.

On remand, after applying the arm-of-the-state analysis, the district court concluded that each appellee is part of its respective state and thus not a "person" under the Act, and so again granted appellees' motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). Dr. Oberg then timely noted this appeal.

On review of a Rule 12(b)(6) dismissal, we consider a case de novo. See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011). We evaluate only whether the complaint states "a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 547 (2007). In doing so, we construe "facts in the light most favorable to the plaintiff," Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009), and "draw all reasonable inferences in [his] favor" Kolon Indus., 637 F.3d at 440. Yet "we need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Kloth v. Microsoft Corp., 444 F.3d 312, 319 (4th Cir. 2006). Nor do we credit allegations that offer only "naked assertions devoid of further factual enhancement." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotations marks, alteration, and citation omitted).

6

Moreover, in reviewing a Rule 12(b)(6) dismissal, we are not confined to the four corners of the complaint. It is well established that "we may properly take judicial notice of matters of public record," including statutes. Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). We may also consider "documents incorporated into the complaint by reference," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007), "as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic," Philips, 572 F.3d at 180. Thus, before us, the parties properly cite to and rely on state statutes and exhibits integral to the complaint.

Finally, we note that although arm-of-the-state status may well constitute an affirmative defense in the related Eleventh Amendment context, this is not so in an FCA case. To succeed in an FCA case, a relator must demonstrate that a defendant is a "person" within the meaning of the Act. As the dissent recognizes, this is "a statutory question." Dissent. Op. at 36. That is, personhood is an element of the statutory FCA claim, not an immunity providing a defense from suit as in the Eleventh Amendment context. See, e.g., U.S. ex rel. Adrian v. Regents of Univ. of Cal., 363 F.3d 398, 401-02 (5th Cir. 2004) (dismissing

7

FCA action on 12(b)(6) motion because "the FCA does not provide a cause of action against state agencies").[3]

## II.

In applying the arm-of-the-state analysis, we consider four nonexclusive factors to determine whether an entity is "truly subject to sufficient state control to render [it] a part of the state." Oberg I, 681 F.3d at 579.

First, when (as here), an entity is a defendant, we ask "whether any judgment against the entity as defendant will be paid by the State." Oberg I, 681 F.3d at 580 (quoting S.C. Dep't Disabilities & Special Needs v. Hoover Universal, Inc., 535 F.3d 300, 303 (4th Cir. 2008)).[4] The Supreme Court has

---

[3] The dissent's suggestion to the contrary thus misses the mark. Tellingly, it offers only Eleventh Amendment cases in support of its contention that arm-of-the-state status is an affirmative defense. See Dissent. Op. at 35-36. But the Supreme Court has made clear that the statutory FCA question is distinct from the Eleventh Amendment inquiry. See Stevens, 529 U.S. at 779-80 (explaining that the Court initially considers whether "the [FCA] itself permits the cause of action it creates to be asserted against States" before reaching the Eleventh Amendment sovereign immunity question).

[4] When an entity is a plaintiff, this factor requires us to determine "whether any recovery by the entity as plaintiff will inure to the benefit of the State." Hoover Universal, 535 F.3d at 303. We previously regarded the first factor as "the most important consideration," Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n, 822 F.2d 456, 457 (4th Cir. 1987), and the dissent seems to regard it as dispositive, see Dissent. Op. at 41. But as we noted in Oberg I, 681 F.3d at 580 n.3, more
(Continued)

8

instructed that in assessing this factor, an entity's "potential legal liability" is key. Regents, 519 U.S. at 431; see also Parker v. Franklin Cnty. Cmty. Sch. Corp., 667 F.3d 910, 927–28 (7th Cir. 2012) (focusing on legal liability for payment of a judgment in the wake of Regents); Cooper v. Se. Penn. Transp. Auth., 548 F.3d 296, 303 (3d Cir. 2008)(same); U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah, 472 F.3d 702, 718 (10th Cir. 2006) (same). Thus, we consider whether state law "provides that obligations of [the entity] shall not be binding on [the] State." Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency, 440 U.S. 391, 402 (1979) (emphasis in original). In doing so, we look to whether "State law indicates that a judgment against [the entity] can be enforced against the State." Cash v. Granville Cnty. Bd. of Educ., 242 F.3d 219, 224 (4th Cir. 2001).

An entity may also constitute an arm of the state "where the state is functionally liable, even if not legally liable." Stoner v. Santa Clara Cnty. Office of Educ., 502 F.3d 1116, 1122 (9th Cir. 2007) (emphasis added); see also Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 50 (1994) ("Where an agency is

recent Supreme Court precedent suggests that although this factor remains of "considerable importance," Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 430 (1997), it does not deserve dispositive preeminence, see Fed. Maritime Comm'n v. S.C. State Ports Auth., 535 U.S. 743, 765 (2002).

9

so structured that, as a practical matter, if the agency is to survive, a judgment must expend itself against state treasuries, common sense and the rationale of the eleventh amendment require that sovereign immunity attach to the agency.") (internal quotation marks and alteration omitted).

Second, we assess "the degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions." Oberg I, 681 F.3d at 580 (quoting Hoover Universal, 535 F.3d at 303). Also relevant to the autonomy inquiry is the determination whether an entity has the ability to contract, sue and be sued, and purchase and sell property, see Cash, 242 F.3d at 225; Ram Ditta, 822 F.2d at 458, and whether it is represented in legal matters by the state attorney general, see, e.g., Md. Stadium Auth. v. Ellerbe Becket, Inc., 407 F.3d 255, 264 (4th Cir. 2005).

Third, we consider "whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns." Oberg I, 681 F.3d at 580 (quoting Hoover Universal, 535 F.3d at 303). "Non-state concerns," however, do not mean only "local" concerns, but rather also encompass other non-state interests like out-of-state operations. See Hoover Universal, 535 F.3d at 307 (characterizing this factor as

10

"whether the entity is involved with statewide, as opposed to local or other non-state concerns") (emphasis added).

Fourth, we look to "how the entity is treated under state law, such as whether the entity's relationship with the State is sufficiently close to make the entity an arm of the State." Oberg I, 681 F.3d at 580 (quoting Hoover Universal, 535 F.3d at 303). Whether an entity is an arm of the state is ultimately a question of federal law, "[b]ut that federal question can be answered only after considering the provisions of state law that define the agency's character." Regents, 519 U.S. at 429 n.5. "In addressing this factor, a court may consider both the relevant state statutes, regulations, and constitutional provisions which characterize the entity, and the holdings of state courts on the question." Md. Stadium Auth., 407 F.3d at 265 (internal quotation marks omitted).

With these principles in mind, we now apply arm-of-the-state analysis to each of the appellees.


III.

We initially consider the Pennsylvania Higher Education Assistance Agency ("PHEAA"). In 1963, the Pennsylvania General Assembly created PHEAA, which, according to PHEAA itself, now constitutes one of the nation's largest providers of student financial aid services. Although PHEAA continues to administer

11

state-funded student aid programs in Pennsylvania, it acknowledges that it also operates nationally under the names American Education Services and FedLoan Servicing.

The first factor in the arm-of-the-state analysis, whether Pennsylvania would pay a judgment against PHEAA in this case, weighs decidedly against holding that PHEAA is an arm of the state. For "instead of the state treasury being directly responsible for judgments against [PHEAA], [state law] expressly provides that obligations of [PHEAA] shall not be binding on [the] State." Lake Country Estates, 440 U.S. at 402 (emphasis in original). Pennsylvania explicitly disavows liability for all of PHEAA's debts. See 24 Pa. Cons. Stat. § 5104(3)(2012) ("no obligation of the agency shall be a debt of the State"). In addition, state law emphasizes that PHEAA's debts are not "payable out of any moneys except those of the corporation." Id. Aside from state appropriations that go directly to students in the form of education grants, moreover, PHEAA's substantial "moneys" derive exclusively from its own operations. The Pennsylvania treasury is thus neither legally nor functionally liable for any judgment against PHEAA. See Stoner, 502 F.3d at 1122.

Nevertheless, PHEAA contends that the important first factor weighs in favor of concluding that it is an arm of the state because state statutes require that its funds be deposited

12

into the state treasury and that "no money" be paid from the treasury without approval from the state treasurer. See 24 Pa. Cons. Stat. § 5104(3); 72 Pa. Cons. Stat. § 307 (2013). This argument, however, ignores "a commonplace of statutory construction that the specific governs the general." Morales v. Trans World Airlines, 504 U.S. 374, 384 (1992). The statutory provisions specifically outlining PHEAA's "powers and duties" clearly indicate that PHEAA's board of directors -- not the state treasurer -- controls PHEAA's funds. Those statutes provide that PHEAA's funds "shall be available to the agency" and "may be utilized at the discretion of the board of directors for carrying out any of the corporate purposes of the agency." 24 Pa. Cons. Stat. § 5104(3). Further, the state treasurer may use PHEAA's funds only for purposes "consistent with guidelines approved by the board of directors." Id.

Moreover, PHEAA's funds are held in a segregated account apart from general state funds. Id. § 5105.10. Our sister circuits have recognized that such an arrangement counsels against establishing arm-of-the-state status under this factor. The First Circuit, for instance, held that the University of Rhode Island is not an arm of its state in part because its funds are not "merged with[] the general fund, but are kept in segregated accounts [in the state treasury] pending discretionary disbursement by the [University's] Board." Univ.

13

of R.I. v. A.W. Chesterton Co., 2 F.3d 1200, 1210 (1st Cir. 1993). Similarly, the Third Circuit, in assessing whether the Public School Employees' Retirement Board of Pennsylvania was an arm of the state, remanded the case for further consideration in part because -- like PHEEA's account -- the entity's fund was "set apart in the state treasury from general state funds and [] administered by the State Treasurer at the discretion of the Board." Blake v. Kline, 612 F.2d 718, 723 (3d. Cir. 1979) (footnote and citations omitted). In sum, because state law instructs that PHEAA would pay any judgment in this case with its own moneys from its segregated fund, see 24 Pa. Cons. Stat. § 5104(3)(2012), the first factor weighs heavily against holding that PHEAA is an arm of the state.

The second factor, the degree of autonomy exercised by the entity, presents a closer question. PHEAA's board of directors is composed of gubernatorial appointees and state legislators or officials. See 24 Pa. Cons. Stat. § 5103 (repealed July 2010, but effective during the period when PHEAA allegedly violated the FCA). Such an arrangement frequently indicates state control. See Md. Stadium Auth., 407 F.3d at 264. Further, state officials exercise some degree of veto power over PHEAA's operations. For example, the Auditor General may review PHEAA's activities, 24 Pa. Cons. Stat. § 5108, and PHEAA must seek the approval of the Governor in order to issue notes and bonds, id.

14

§ 5104(3). These factors may mean, as PHEAA contends, that it is simply a tool of the state.

But other indicia relevant to the autonomy analysis -- PHEAA's source of funding, control over its revenues, and corporate powers -- strongly suggest that PHEAA is not an arm of the state. Most critically, PHEAA is financially independent. According to its annual reports, which were attached to the amended complaint, PHEAA receives no operational funding from Pennsylvania. See also Appellees' Br. 53 (conceding the point). Pennsylvania law, moreover, expressly instructs that PHEAA's funds "shall be available to the agency," and that PHEAA's board may use those funds in any manner that furthers the agency's corporate purposes. 24 Pa. Cons. Stat. § 5104(3). Meanwhile, the state treasurer's use of PHEAA's funds must adhere to "guidelines approved by the board" of PHEAA. Id. Finally, PHEAA has the power to enter into contracts, sue and be sued, and purchase and sell property in its own name, all of which suggest operational autonomy. See Cash, 242 F.3d at 225; Ram Ditta, 822 F.2d at 458. Although the facts relevant to this second factor cut both ways, when we consider "all reasonable inferences in favor of the plaintiff" as we must at this stage, Kolon Indus., 637 F.3d at 440, we conclude that this factor also counsels against holding that PHEAA is an arm of the state.

15

The third factor is whether PHEAA "is involved with statewide, as opposed to local or other non-state concerns." Hoover Universal, 535 F.3d at 307. Dr. Oberg poses two arguments relevant to this factor.

Initially, he contends that due to PHEAA's commercial focus, its operations do not involve an area of legitimate state concern. See Appellant's Br. 43; Reply Br. 25-26. This argument fails. Pennsylvania created PHEAA to finance, make, and guarantee loans for higher education, and "[h]igher education is an area of quintessential state concern and a traditional state government function." Md. Stadium Auth., 407 F.3d at 265. PHEAA does not provide higher education directly, but it nonetheless facilitates the attainment of education by supplying student financial aid services. This work is clearly of legitimate state concern.

Dr. Oberg's remaining argument as to the third factor is that PHEAA's operations from 2002 to 2006 -- during the time in which PHEAA allegedly conducted fraudulent transactions in violation of the FCA -- were so focused out of state that PHEAA was not involved primarily with state concerns.[5] See Ram Ditta,

_____

[5] PHEAA counters that out-of-state operations are irrelevant because this factor is concerned only with whether an entity's focus is statewide as opposed to local. The argument is misguided. Rather, this factor looks to "whether the entity is (Continued)

16

822 F.2d at 459; cf. Hoover Universal, 535 F.3d at 307. To this end, Dr. Oberg alleges that "PHEAA conducts substantial operations outside of Pennsylvania," and that as early as 2005, "one-third of PHEAA's earnings c[a]me from outside the [C]ommonwealth," after which it further "expanded its operations." PHEAA's financial reports, cited throughout Dr. Oberg's complaint, tend to corroborate these claims, so there is little doubt that during the period in question PHEAA's operations extended well beyond the borders of Pennsylvania. Even so, if only one-third of PHEAA's earnings came from outside Pennsylvania in 2005, it does not seem plausible that by 2006 -- the last year encompassed by Dr. Oberg's allegations -- PHEAA's operations focused primarily out of state. See Ram Ditta, 822 F.2d at 459; see also Iqbal, 556 U.S. at 678 (explaining that "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief") (internal quotation marks and citation omitted). Therefore, we believe this factor weighs in favor of arm-of-the-state status for PHEAA.

---

involved with statewide, as opposed to local or other non-state concerns." Hoover Universal, 535 F.3d at 307 (emphasis added).

17

The final factor, how PHEAA is treated under state law, also supports PHEAA's contention that it is an arm of Pennsylvania. A state statute provides that "the creation of the agency [was] in all respects for the benefit of the people . . . and the agency [performs] an essential governmental function." 24 Pa. Cons. Stat. § 5105.6. PHEAA's enabling legislation was made effective by "amendment to the Constitution of Pennsylvania authorizing grants or loans for higher education," id. § 5112, and Pennsylvania state courts have concluded that PHEAA is a state agency for jurisdictional purposes, see, e.g., Richmond v. Penn. Higher Educ. Assistance Agency, 297 A.2d 544, 546 (1972); Penn. Higher Educ. Assistance Agency v. Barksdale, 449 A.2d 688, 689-90 (1982).

In sum, although the third and fourth factors suggest that PHEAA is an arm of the state, the first (strongly) and second (albeit less strongly) point in the opposite direction. At this early stage, construing the facts in the light most favorable to the plaintiff, Nemet Chevrolet, 591 F.3d at 255, we must conclude that Dr. Oberg has alleged sufficient facts that PHEAA is not an arm of the state, but rather a "person" for FCA purposes. We therefore vacate the judgment of the district court as to PHEAA and remand to permit limited discovery on the question whether PHEAA is "truly subject to sufficient state

18

control to render [it] a part of the state." Oberg I, 681 F.3d at 579.

IV.

We next consider whether Dr. Oberg's complaint states a plausible claim that the Vermont Student Assistance Corporation ("VSAC") is a "person" subject to suit under the FCA. The Vermont legislature created VSAC in 1965 to provide Vermont residents with opportunities to attend college by awarding education grants and financing student loans. Vt. Stat. Ann. tit. 16, § 2821(a) (2013). According to VSAC's financial statements -- referenced repeatedly in Dr. Oberg's complaint -- the agency currently administers a state grant program and a higher education investment plan; originates, services, and guarantees student loans; and provides higher education information and counseling services.

The upshot of the first arm-of-the-state factor -- who would pay a judgment in this case -- is unclear. State law provides no definite guidance. On one hand, Dr. Oberg alleges that Vermont would not pay a judgment because the state disclaims legal liability for VSAC's debts. Yet, in contrast to Pennsylvania, which disavows liability for any and all of PHEAA's obligations, see 24 Pa. Cons. Stat. § 5104(3), Vermont does so only with respect to VSAC's debt obligations issued to

19

finance loans for higher education, see Vt. Stat. Ann. tit. 16, § 2823(f); id at § 2868(i). Dr. Oberg has identified no state law indicating that a judgment obligation could not be enforced against the state, and we have found none. See Lake Country Estates, 440 U.S. at 402 (finding relevant whether state law "provides that obligations of [the entity] shall not be binding on [the] State").

On the other hand, VSAC's contention that Vermont would pay a judgment rests on the state's duty to "support and maintain" VSAC. Vt. Stat. Ann. tit. 16, § 2823(a). But an obligation stated in such general terms is not conclusive. Moreover, although state appropriations compose nearly twenty percent of VSAC's revenues, such funding goes entirely to students in the form of need-based grants. Thus, whether Vermont would be legally or functionally liable for a judgment here is unclear. At this stage, however, we must construe all facts in the light most favorable to the plaintiff, Nemet Chevrolet, 591 F.3d at 255, so we assume that this critical (albeit not dispositive) first factor weighs against arm-of-the-state status for VSAC.

The second factor, VSAC's degree of autonomy from the state, also presents a close question. Vermont law provides that eight members of VSAC's eleven-member board of directors are either state officials or gubernatorial appointees, and that the board elects the remaining three members. Vt. Stat. Ann.

20

tit. 16, § 2831. Moreover, Vermont retains important oversight authority over VSAC. The state "reserves the right at any time to alter, amend, repeal or otherwise change the structure, organization, programs, or activities" of VSAC, id. § 2821(b), and state law provides that VSAC may issue no debt obligation "without the approval in writing of the governor," id. § 2823(f).

Other autonomy indicators, however, counsel against holding that VSAC is an arm of the state. VSAC not only exercises corporate powers including the capacity to contract and sue and be sued, see Cash, 242 F.3d at 225, it is also, like PHEAA, financially independent. VSAC's financial statements, cited throughout the complaint, indicate that VSAC uses state appropriations only for need-based educational grants; no state funds finance its operations. In addition, VSAC's board is broadly empowered to adopt policies and regulations governing its lending activities, Vt. Stat. Ann. tit. 16, § 2834, and "to do any and all acts and things as may be necessary" to secure its debt obligations, id. § 2868(d). Thus, although we recognize that certain facts relevant to the autonomy analysis suggest that VSAC is an arm of the state, others weigh decidedly against that conclusion. Once again "draw[ing] all reasonable inferences in favor of the plaintiff," Kolon Indus., 637 F.3d at

440, we believe this factor also counsels against holding as a matter of law that VSAC is an arm of the state.

As to the third factor, whether VSAC is involved with statewide concerns, Dr. Oberg alleges that this factor weighs against holding that VSAC is an arm of the state because "Vermont law allows VSAC to conduct business in other States" and the agency has "contracted with borrowers and companies outside Vermont." But these assertions do not equate to an allegation that VSAC's operations centered primarily outside Vermont at any point in time. See Ram Ditta, 822 F.2d at 459. Indeed, Dr. Oberg's allegations here fall short even of those he offers as to PHEAA's extra-state operations, which we have held do not rise to the level of establishing a plausible claim of arm-of-the-state status under this factor. See Iqbal, 556 U.S. at 678. Rather, VSAC's financial statements indicate that during the period in question the agency was focused on the statewide concern of facilitating postsecondary educational opportunities for residents of Vermont.

With respect to the fourth factor, how state law treats the entity, Dr. Oberg alleges that Vermont does not treat VSAC as it treats "true agencies of the state." But in fact Vermont law expressly provides that VSAC "shall be an instrumentality of the state," Vt. Stat. Ann. tit. 16, § 2823(a), exempts VSAC from all taxation, id. § 2825, and "designate[s] [VSAC] as the state

22

agency to receive federal funds assigned to the state of Vermont for student financial aid programs," id. § 2823(c).

In sum, although the first and second factors present close questions, we must conclude in compliance with Rule 12(b)(6) that both weigh against holding VSAC an arm of the state. Accordingly, while the third and fourth factors suggest otherwise, we must also hold that Dr. Oberg's allegations as to VSAC are sufficient to survive a motion to dismiss. This is so particularly given the first factor's enduring importance. See supra at 8 n.4. We recognize that some of Dr. Oberg's allegations test the outer bounds of the plausibility standard, but at this juncture, we must construe all facts in the light most favorable to the plaintiff. We therefore vacate the judgment of the district court with respect to VSAC and remand to permit limited discovery on this question.

V.

Finally, we consider whether the Arkansas Student Loan Authority ("ASLA") is an arm of the state of Arkansas. The state legislature created ASLA in 1977 to help Arkansas provide higher educational opportunities for its residents. Ark. Code Ann. § 6-81-102 (2013). ASLA currently originates and disburses student loans at postsecondary schools throughout the state. It

23

also sponsors outreach services to increase awareness about financial aid in higher education.

In contrast to PHEAA and VSAC, all four factors weigh in favor of holding that ASLA is an arm of the state. First, although § 6-81-113 of the Arkansas Code disavows liability for debt obligations issued to finance student loans, it says nothing about liability for other debts like a judgment obligation. Critically, Arkansas statutes elsewhere indicate that state revenues would be used to satisfy a judgment against ASLA. State law instructs that "[a]ll moneys received by [ASLA]" from its lending operations are "specifically declared to be cash funds," and further, that "cash funds" are "revenues of the state." Id. at §§ 6-81-118(a)(1), 19-6-103. Accordingly, because ASLA's income derives overwhelmingly from its lending activities, and because such income statutorily belongs to Arkansas, it follows that the state would foot the bulk of any judgment against ASLA. Dr. Oberg's allegations to the contrary establish only a dubious possibility that ASLA could procure some "other income" with which to satisfy a judgment. See Reply Br. at 14. More is required to survive a motion to dismiss. See Iqbal, 556 U.S. at 678.

The dissent misses the mark in contending that Arkansas's statutory scheme is "similar in many ways to that in Pennsylvania," Dissent. Op. at 50 n.4, and that state funds

24

would not be used to satisfy a judgment against ASLA because, "in reality," Arkansas "claims" only ASLA's "surplus revenues," Dissent. Op. at 51. Arkansas does not, "in reality," "claim" only ASLA's "surplus revenues" as revenues of the state. Arkansas law expressly provides that "all moneys" received by ASLA in connection with its lending activities are revenues of the state. Ark. Code Ann. §§ 6-81-118(a)(1), 19-6-103. And Arkansas law carefully cabins ASLA's use of those state revenues to certain lending costs, id. § 6-81-118(b)-(c), an arrangement far removed from the Pennsylvania scheme granting PHEAA "discretion[ary]" authority to use its funds for any corporate purpose, see 24 Pa. Cons. Stat. § 5104(3).

The dissent also misses the mark in suggesting that our analysis here is "directly contrary" to that in Hess v. Port Authority Trans-Hudson Corp., 513 U.S. 30 (1994), for this contention ignores crucial differences between the two cases. While ASLA is a corporation created by a single state to further educational opportunities in that state, the Port Authority in Hess is a bistate "Compact Clause entity" with "diffuse" political accountability. Id. at 42. Because Congress must authorize the creation of such bistate entities, see U.S. Const. art. 1, § 10, cl. 3, they "owe their existence to [both] state and federal sovereigns" and so "lack the tight tie to the people of one State that an instrument of single State has," Hess, 513

25

U.S. at 42. For this reason, the Supreme Court recognizes a "general approach" for Compact Clause entities, like the Port Authority, under which a court will "presume" that they are not arms of the state. Id. at 43. (Of course, the Court has established no similar "general approach" for state-created corporations like ASLA.)

Notwithstanding this presumption, and even though no state appropriated funds to the Port Authority or claimed the Authority's income as its revenue, the Authority argued that it was an arm of a state because it dedicated some of its surplus to "public projects which the States themselves might otherwise finance." Id. at 50. The Supreme Court had little difficulty rejecting that argument, noting that because the Authority was a profitable Compact Clause entity that retained and controlled its income, the associated states would not pay a judgment against it. Id. at 51. ASLA, by contrast, is "an instrument of a single [s]tate," id. at 43, and state law expressly provides that all of its lending income belongs to that state. Thus, state funds necessarily would be used to pay a judgment against ASLA. In sum, Hess does not in any way undermine our holding

that this first factor indicates that ASLA is an arm of the state.[6]

As to the second arm-of-the-state factor, ASLA operates with little autonomy from Arkansas despite its corporate powers. State legislative records establish that, unlike Pennsylvania and Vermont, Arkansas provides its student loan corporation substantial funding.[7]   Moreover, the Arkansas Attorney General

---

[6] The dissent disputes this conclusion for two additional reasons.   Relying on the principle that the "specific governs the general," Morales, 504 U.S. at 384, the dissent notes that only general statutory provisions -- not those "exclusively applicable to ASLA" -- define "cash funds" as "revenues of the state."   See Dissent. Op. at 48-49.   But the principle of statutory construction on which the dissent relies applies only where general and specific statutory provisions conflict, or where a general provision would render a more specific one superfluous.   See RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 132 S. Ct. 2065, 2071 (2012).   The principle finds no footing where, as here, specific and general statutory provisions do not conflict, but rather go hand in hand.   That is, the specific provision defining ASLA's revenues as "cash funds" is entirely consistent with the general provision declaring that "cash funds" are revenues of the state.
The dissent also posits that "the fact that ASLA's funds are held in a segregated fund outside the state treasury counsels against arm-of-state status."   Dissent. Op. at 49.   As a general rule, we agree that such an arrangement would weigh against holding that an entity is an arm of its state.   But Arkansas is an exception to this general rule, because state law expressly declares agency income deposited outside the state treasury to be revenue of the state.   Ark. Code Ann. § 19-6-103. In contrast to the dissent's suggestion, see Dissent. Op. at 50 n.4, ASLA's statutory scheme thus operates nothing like that governing PHEAA.

[7] The dissent unconvincingly suggests that this funding is irrelevant to the autonomy inquiry because it derives from ASLA's own cash funds.   Dissent. Op. at 51, 55.   But the source
(Continued)

represents ASLA in litigation, including the case at hand, and state law limits ASLA's powers in several significant ways. For example, Arkansas subjects ASLA's use of cash funds to approval by the General Assembly, Ark. Code Ann. § 19-4-802, and prevents its sale of bonds "until the bond issue has the written approval of the Governor after he or she has received the approval of the State Board of Finance," id. § 6-81-108.

Critically, the Governor of Arkansas also appoints every member of ASLA's board of directors. See id. § 6-81-102(d). "The fact that all of [an entity's] decisionmakers are appointed by the Governor," we have recognized, "is a key indicator of state control." Md. Stadium Auth., 407 F.3d at 264; see also, Hoover, 353 F.3d at 307; Kitchen, 286 F.3d at 185; Cash, 242 F.3d at 225. The dissent all but ignores this fact, claiming instead that ASLA is autonomous because its board members serve fixed terms and may not be removed at will. Dissent. Op. at 56. This argument fails. Even where board members serve fixed terms, state authority to appoint all of an entity's

---

of state funds used to support ASLA's operations matters not. What matters is whether an entity's funds belong to the state. See supra at 25-26. In this case, state law expressly provides that they do. Every dollar ASLA earns through its lending activities becomes a dollar of state revenue "to be used as required and to be expended only for such purposes and in such manner as determined by law." Ark. Code Ann. § 19-6-103. That Arkansas, in its discretion, returns some of this money to ASLA to finance its operations does not change that fact.

decisionmakers remains powerful evidence of state control. See Md. Stadium Auth., 407 F.3d at 258, 264 (stressing importance of power to appoint although board members "serve five year terms"). Arkansas law, moreover, is equivocal with respect to the governor's removal power. Indeed, it suggests that the governor may remove board members simply by selecting new ones, as appointments to ASLA's board are for four-year terms "or until a successor is appointed." Ark. Code Ann. § 6-81-102(e).

Third, with respect to whether ASLA is focused on state concerns, Dr. Oberg merely alleges that Arkansas law "allows ASLA to lend to any qualified borrower nationwide" and that ASLA "can and has entered into contracts with institutions outside Arkansas." The operative question, however, is whether ASLA is primarily involved with state concerns. See Ram Ditta, 822 F.2d at 459. And Dr. Oberg has alleged no facts indicating that ASLA is not primarily involved with the state concern of helping to finance higher education for Arkansas residents. The dissent, while conceding that student-loan financing facilitates the important state goal of educating youth, maintains that ASLA is also engaged in non-state concerns like "the servicing of federal student loans." Dissent. Op. at 55. But ASLA's federal-loan servicing work did not begin until 2012, so is irrelevant to the question whether ASLA was a "person" within

the meaning of the FCA from 2002 to 2006 when it allegedly violated the Act.

Fourth, as the dissent agrees, Arkansas law plainly treats ASLA as an arm of the state. ASLA was established by state law as "the instrumentality of the state charged with a portion of the responsibility of the state to provide educational opportunities." Ark. Code Ann. § 6-81-102(c). Its lending revenues are statutorily defined as "revenues of the state," id. §§ 6-81-118, 19-6-103, and the Supreme Court of Arkansas has described ASLA as "a state agency created by . . . the 1977 Acts of Arkansas," Turner v. Woodruff, 689 S.W.2d 527, 528 (Ark. 1985).

In short, we conclude that each of the four factors counsels in favor of holding that ASLA is an arm of the state. To be sure, as the dissent points out, arm-of-the-state analysis is a fact-intensive inquiry often ill suited to judgment on the pleadings. See Dissent. Op. at 58-59. But where, as with ASLA, the relevant facts are clear, Rule 12(b)(6) mandates dismissal. See, e.g., Stoner, 502 F.3d at 1121-23 (dismissing FCA action on 12(b)(6) motion); Adrian, 363 F.3d at 401-02 (same). We therefore hold that ASLA is an arm of Arkansas and so not subject to suit under the FCA.

30

VI.

We affirm the judgment of the district court with respect to ASLA. We vacate that portion of the district court's judgment dismissing Dr. Oberg's FCA claims against PHEAA and VSAC and remand for further proceedings consistent with this opinion.

AFFIRMED IN PART,
VACATED IN PART,
AND REMANDED

TRAXLER, Chief Judge, concurring in the judgment in part and dissenting in part:

This is an appeal from the granting of a Rule 12(b)(6) motion to dismiss, a motion that tests the plausibility of the plaintiff's allegations rather than the plaintiff's ability to ultimately prove his allegations or the defendant's ability to establish a defense. In my view, plaintiff Jon Oberg's Fourth Amended Complaint plausibly alleges that all of the defendant student-loan corporations (together, the "Loan Companies") are "persons" against whom an action under the False Claims Act (the "FCA") can be maintained. Whether the Loan Companies qualify as arms of their creating states is an affirmative defense that need not be anticipated or negated by the allegations of the complaint, see Goodman v. Praxair, Inc., 494 F.3d 458, 466 (4th Cir. 2007) (en banc), and is a question that cannot be finally resolved here without discovery and fact-finding by the district court.

Accordingly, I concur in that portion of the judgment vacating the dismissal of Oberg's False Claims Act claims asserted against the Pennsylvania Higher Education Assistance Agency ("PHEAA") and the Vermont Student Assistance Corporation ("VSAC"), but I dissent from the dismissal of the claims asserted against the Arkansas Student Loan Authority ("ASLA").

32

I.

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint"; the motion "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Butler v. United States, 702 F.3d 749, 752 (4th Cir. 2012) (internal quotation marks omitted), cert. denied, 133 S. Ct. 2398 (2014).

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege facts plausibly establishing the elements of his asserted cause of action. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012), cert. denied, 133 S. Ct. 1493 (2013). While the plaintiff is not required to "forecast evidence sufficient to prove the elements of the claim," he "must allege sufficient facts to establish those elements" and "advance [his] claim across the line from conceivable to plausible." Walters, 684 F.3d at 439 (internal quotation marks omitted). When considering a motion to dismiss, we give no deference to legal conclusions asserted in the complaint, but we must accept all factual allegations as true. See id.

II.

Broadly speaking, the False Claims Act imposes liability on a "person" who knowingly presents a false or fraudulent claim

33

for payment or knowingly makes or uses a false record or statement material to a false claim. See 31 U.S.C. § 3729(a)(1)(A) & (B). In order to survive the motion to dismiss, Oberg was therefore obliged to plead facts plausibly establishing that the named defendants are "persons" within the meaning of the FCA.

While states are not "persons" subject to qui tam actions under the FCA, see Vt. Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 787-88 (2000), corporations, including municipal corporations like cities and counties, are "persons" under the Act, see Cook Cnty. v. United States ex rel. Chandler, 538 U.S. 119, 134 (2003); see also 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise[,] . . . the word[] 'person' . . . include[s] corporations . . . ."). There is no dispute that each of the Loan Companies is a corporation, and Oberg alleged the corporate status of each Loan Company in his complaint. Because corporations are presumed to be "persons" under the FCA, Chandler, 538 U.S. at 126, Oberg's allegations of corporate status plausibly established that the Loan Companies are "persons" within the meaning of the FCA, see Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level.").

34

The Loan Companies, however, all contend that they are alter-egos or arms of their creating states. The Companies therefore argue that they, like the states themselves, do not qualify as "persons" under the FCA. Arm-of-state status is an Eleventh-Amendment-based inquiry focused on determining whether a state-created entity is so closely related to the state that it should be permitted to share in the state's sovereign immunity. See United States ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp., 681 F.3d 575, 580 (4th Cir. 2012) ("Oberg I"). Although this court has not addressed the issue, the circuits that have considered similar assertions of arm-of-state status have uniformly concluded that it is an affirmative defense to be raised and established by the entity claiming to be an arm of the state. See Sung Park v. Ind. Univ. Sch. of Dentistry, 692 F.3d 828, 830 (7th Cir. 2012) ("[S]overeign immunity is a waivable affirmative defense."); Aholelei v. Dep't of Pub. Safety, 488 F.3d 1144, 1147 (9th Cir. 2007) ("Eleventh Amendment immunity is an affirmative defense . . . ." (internal quotation marks omitted)); Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ., 466 F.3d 232, 237-39 (2d Cir. 2006) (treating Eleventh Amendment immunity "as akin to an affirmative defense"); see also Gragg v. Ky. Cabinet for Workforce Dev., 289 F.3d 958, 963 (6th Cir. 2002) ("[T]he entity asserting Eleventh Amendment immunity has the burden to show that it is entitled to

35

immunity, i.e., that it is an arm of the state."); Skelton v. Camp, 234 F.3d 292, 297 (5th Cir. 2000) (holding that the party seeking immunity "bear[s] the burden of proof in demonstrating that [it] is an arm of the state entitled to Eleventh Amendment immunity"); Christy v. Pa. Turnpike Comm'n, 54 F.3d 1140, 1144 (3d Cir. 1995) ("[T]he party asserting Eleventh Amendment immunity (and standing to benefit from its acceptance) bears the burden of proving its applicability."). I believe these decisions were correctly decided and that the arm-of-state issue raised by the Loan Companies is an affirmative defense.[1]

Preliminarily, although a plaintiff must plead facts establishing that the court has jurisdiction over his claim, see, e.g., Pinkley, Inc. v. City of Frederick, 191 F.3d 394, 399 (4th Cir. 1999), the arm-of-state issue here is not jurisdictional. Instead, as the Supreme Court made clear in Stevens, it is a statutory question of whether the defendants named by Oberg qualify as "persons" under the FCA. See Stevens, 529 U.S. at 779 (distinguishing the question whether the FCA

---

[1] In our first opinion, we concluded that the district court had not applied the arm-of-state analysis, and we remanded the case for the district court to apply that analysis in the first instance. See United States ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp., 681 F.3d 575, 581 (4th Cir. 2012). While we noted that the ultimate question of whether the Loan Companies were subject to suit under the FCA did not turn solely on their corporate status, see id. at 579, we did not consider the sufficiency of Oberg's allegations or address whether arm-of-state status was an affirmative defense.

permits actions against states from whether the Eleventh Amendment would prohibit such an action and electing to resolve the case on statutory grounds).

Moreover, the arm-of-state claim operates like other affirmative defenses, in that the claim would preclude liability even if all of Oberg's allegations of wrongdoing are true. See Emergency One, Inc. v. Am. Fire Eagle Engine Co., 332 F.3d 264, 271 (4th Cir. 2003) ("[A]ffirmative defenses share the common characteristic of a bar to the right of recovery even if the general complaint were more or less admitted to." (internal quotation marks and alteration omitted)); Black's Law Dictionary (9th ed. 2009) (defining "affirmative defense" as "[a] defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true."). In my view, then, the arm-of-state status asserted by the Loan Companies must be treated as an affirmative defense. And once the arm-of-state issue in this case is recognized as an affirmative defense, the error in dismissing Oberg's claims on the pleadings becomes apparent.

As noted above, a Rule 12(b)(6) motion "test[s] the sufficiency of a complaint" but "does not resolve contests . . . [about] the merits of a claim or the applicability of defenses." Butler, 702 F.3d at 752 (internal quotation marks omitted). A

37

plaintiff therefore has no "obligation to anticipate" an affirmative defense by pleading facts that would refute the as-yet unasserted defense. Gomez v. Toledo, 446 U.S. 635, 640 (1980); see McMillan v. Jarvis, 332 F.3d 244, 248 (4th Cir. 2003); Guy v. E.I. DuPont de Nemours & Co., 792 F.2d 457, 460 (4th Cir. 1986); accord de Csepel v. Republic of Hungary, 714 F.3d 591, 607-08 (D.C. Cir. 2013) ("[A]lthough it is certainly true that plaintiffs must plead the elements of their claims with specificity, they are not required to negate an affirmative defense in their complaint . . . ." (internal quotation marks and alteration omitted)).

As our en banc court explained in Goodman, an affirmative defense may provide the basis for a Rule 12(b)(6) dismissal only "in the relatively rare circumstances . . . [where] all facts necessary to the affirmative defense clearly appear on the face of the complaint." Goodman, 494 F.3d at 464 (internal quotation marks and alteration omitted); see also Xechem, Inc. v. Bristol-Myers Squibb Co., 372 F.3d 899, 901 (7th Cir. 2004) ("Only when the plaintiff pleads itself out of court--that is, admits all the ingredients of an impenetrable defense--may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6).").

Application of these principles to this case requires Oberg to plausibly allege that the Loan Companies are "persons" within the meaning of the FCA. Oberg did just that by alleging that

38

the Companies are corporations operating independently of their creating states. The Loan Companies' contrary claim that they are alter-egos of their creating states is an affirmative defense which they bear the burden of pleading and proving. Because Oberg had no obligation to anticipate that defense by alleging facts establishing that the multi-factored, factually intensive arm-of-state inquiry should be resolved in his favor, the dismissal of his claims at this stage of the proceedings is improper. See Butler, 702 F.3d at 752; Goodman, 494 F.3d at 464, 466.[2]

---

[2] The majority's apparent view that arm-of-state status is an affirmative defense in the Eleventh Amendment context but not in this case is puzzling. Although the arm-of-state inquiry here presents a statutory rather than constitutional question, the principles at stake are the same as in any case raising Eleventh Amendment issues. If arm-of-state status is a waivable affirmative defense when the Eleventh Amendment is directly implicated, so too should it be a waivable affirmative defense when the Eleventh Amendment is indirectly implicated. While "personhood" is clearly an element of a plaintiff's claim under the FCA, Oberg, as previously discussed, carried his burden of demonstrating the Loan Companies' personhood by alleging their independent corporate status. The burden should then fall to the defendants to plead and prove that they are not persons but rather are arms of their creating state. United States ex rel. Adrian v. Regents of University of California, 363 F.3d 398 (5th Cir. 2004), the case relied on by the majority, does not suggest otherwise. In that case, the plaintiff brought an FCA action against an entity – the Regents of the University of California – that courts had repeatedly found to be an arm of the state. See id. at 401-02. The Fifth Circuit did not address the affirmative-defense issue, but its affirmance of a Rule 12(b)(6) dismissal of the claims against an entity previously found to be an arm of the state is consistent with the rule recognized by this court in Goodman that an affirmative defense may be (Continued)

III.

Even if Oberg were somehow required to allege that the Loan Companies are not arms of their states, I believe the allegations of the complaint are still more than sufficient to withstand the motion to dismiss.

As to PHEAA and VSAC, the majority concludes that Oberg's allegations plausibly establish that the companies are not alter-egos of their creating states. Although I agree with the majority's ultimate conclusion as to these defendants, I do not agree with the majority's application of the Rule 12(b)(6) standard to the arm-of-state state factors. The sufficiency of the complaint as to PHEAA and VSAC is not a close question in my view, and I therefore concur only in the judgment vacating the dismissal of Oberg's claims against PHEAA and VSAC. While the question is perhaps a bit closer as to the claims against ASLA, I nonetheless believe the Oberg has plausibly alleged facts establishing that ASLA is not an arm of the state of Arkansas. Accordingly, for the reasons set out below, I dissent from the majority's affirmance of the Rule 12(b)(6) dismissal of Oberg's claims against ASLA.

---

resolved on a Rule 12(b)(6) motion when the facts necessary to the defense appear on the face of the complaint. See Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) (en banc).

40

When determining whether an entity qualifies as an arm of the state, we consider four non-exclusive factors:

> (1) whether any judgment against the entity as defendant will be paid by the State or whether any recovery by the entity as plaintiff will inure to the benefit of the State;
> (2) the degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions;
> (3) whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns; and
> (4) how the entity is treated under state law, such as whether the entity's relationship with the State is sufficiently close to make the entity an arm of the State.

Oberg I, 681 F.3d at 580 (quoting Dep't of Disabilities & Special Needs v. Hoover Universal, Inc., 535 F.3d 300, 303 (4th Cir. 2008)).

While the focus of the first factor is whether the "primary legal liability" for a judgment will fall on the state, Regents of Univ. of Ca. v. Doe, 519 U.S. 425, 428 (1997), we must also consider the practical effect of a judgment against the entity, see Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 51 (1994). "[I]f the State treasury will be called upon to pay a judgment against a governmental entity, then Eleventh Amendment immunity applies to that entity, and consideration of any other factor becomes unnecessary." Cash v. Granville Cnty. Bd. of Educ., 242 F.3d 219, 223 (4th Cir. 2001). "[S]peculative,

indirect, and ancillary impact[s] on the State treasury,"
however, are insufficient to trigger immunity. Id. at 225.

If the state would not be liable for a judgment rendered
against the entity, we must then consider the remaining factors,
which serve to determine whether the entity "is so connected to
the State that the legal action against the entity would,
despite the fact that the judgment will not be paid from the
State treasury, amount to the indignity of subjecting a State to
the coercive process of judicial tribunals at the instance of
private parties." Id. at 224 (internal quotation marks
omitted); see Fed. Mar. Comm'n v. S.C. State Ports Auth., 535
U.S. 743, 760 (2002) ("The preeminent purpose of state sovereign
immunity is to accord States the dignity that is consistent with
their status as sovereign entities."). In my view, Oberg's
complaint contains factually detailed, specific allegations
addressing the treasury factor and the dignity factors so as to
preclude the granting of the motion to dismiss.

A.

The complaint alleges that ASLA, not its creating state,
would be liable for any judgment rendered against it. See J.A.
116-18. While that assertion is arguably a legal conclusion not
entitled to be treated as true, see, e.g., Iqbal, 556 U.S. at
678, the assertion is supported by specific factual allegations
that are supported by statutes, financial reports, and other

42

information specifically referenced in the complaint and properly considered in the context of a motion to dismiss. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). These allegations and information establish the following:

- ASLA is a corporation entitled to enter into contracts, own property, and sue and be sued in its own name. See Ark. Code Ann. § 6-81-102(c) (establishing ASLA as a "public body politic and corporate, with corporate succession").

- Arkansas has specifically disclaimed liability for ASLA's obligations. See Ark. Code Ann. § 6-81-113(a)(3).

- Arkansas law authorizes ASLA to pay expenses associated with its lending activities from the revenues earned from those activities. See Ark. Code Ann. §§ 6-81-118(c)(3), 6-81-124(c)(1).

- ASLA generates substantial income streams and relies on those income streams, rather than state appropriations, to support its business operations, and ASLA has substantial assets from which a judgment could be paid. See J.A 781-827 (ASLA financial statements).

- ASLA has a line of credit provided by Arkansas. ASLA borrowed $50,000,000 under the line of credit in 2008 and repaid the note in full by September 2010. See J.A. 802. ASLA has also borrowed money from a private lender to improve its liquidity, with student loan revenues providing the source of repayment. See J.A. 802.

- ASLA has commercial insurance to protect itself from losses arising out of torts and its errors and omissions. See J.A. 805.

In my view, these allegations are more than sufficient to make plausible Oberg's assertion that the Arkansas state treasury

43

would not be liable for a judgment rendered against ASLA. See Robertson v. Sea Pines Real Estate Cos., 679 F.3d 278, 288 (4th Cir. 2012) ("Plausibility requires that the factual allegations be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." (internal quotation marks and alteration omitted)).

Although the majority considers ASLA's status as a corporation only when analyzing the state-dignity factors, that fact is clearly relevant to the state-treasury factor as well. See Cash, 242 F.3d at 224 (considering entity's corporate form when analyzing state-treasury factor). The fact that Arkansas elected to structure ASLA as a corporation makes it plausible that the state will not be liable for any judgments in this case, since insulating others from liability for corporate debt is one of the signal attributes of the corporate form. See, e.g., Musikiwamba v. ESSI, Inc., 760 F.2d 740, 753 (7th Cir. 1985) ("General corporation law is clear that personal liability for a corporation's debts cannot be imposed on a person merely because he is an officer, shareholder, and incorporator of that corporation."). That Arkansas has specifically disclaimed liability for ASLA's obligations further establishes plausibility, particularly given the absence of any statute requiring Arkansas to pay a judgment against ASLA. See Cash, 242 F.3d at 224-25 (noting the absence of statute authorizing

44

recovery from state coffers when concluding that judgment against entity would not affect state treasury); Gray v. Laws 51 F.3d 426, 436 (4th Cir. 1995) (noting the absence of statute requiring payment by state).

Moreover, the allegations of the complaint and the financial documents referenced in the complaint show that ASLA generates significant revenue streams through its lending and other business activities. ASLA uses those revenues, as required by state law, to pay the expenses of its business activities. In light of these revenue streams, ASLA's ability to raise revenues through other sources, see J.A. 802 (line of credit and private lending available to ASLA), and its insurance protection, it is entirely plausible a judgment in this case will have no legal or practical effect on the Arkansas state treasury. See Burrus v. State Lottery Comm'n, 546 F.3d 417, 420 (7th Cir. 2008) (concluding that state lottery commission was not an arm of the state, in part because the lottery "has no need for recourse to the state treasury" given the "large stream of revenue" it generates).

B.

The allegations of Oberg's complaint likewise plausibly demonstrate that ASLA has significant autonomy and independence from its creating state. The allegations of the complaint and the documents referenced therein establish the following:

45

- ASLA is a corporation entitled to enter into contracts, own property, and sue and be sued in its own name. See Ark. Code Ann. § 6-81-102(l).

- ASLA is governed by a board of directors, none of whom are state officials, who serve fixed terms and are not removable by the governor. See id. § 6-81-102(d) & (e).

- ASLA has authority to structure and operate its business activities as it deems proper, including the authority to issue general obligation bonds secured by its revenues and to create subsidiary corporations. See id. §§ 6-81-102(k), 6-81-102(l)(8)-(10) & (25).

- ASLA is supported by the revenues it earns from its business activities, not by the state. Although ASLA receives appropriations from the state earmarked for salaries and certain operating expenses, the funds so appropriated are "cash funds" earned by ASLA through its business activities. See Ark. Code Ann. § 6-18-118; J.A. 412.

- ASLA's revenues are not deposited into the state treasury, but are deposited into various accounts controlled by ASLA. See Ark. Stat. § 6-81-118(a) & (f).

- ASLA's business activities extend outside the state of Arkansas and include the buying and selling of loan pools on the secondary market and the servicing of loans made directly by the federal government.

- ASLA has borrowed and repaid money from the state of Arkansas, executing a promissory in favor of the state and using its revenues to repay the loan. See J.A. 802.

These allegations are not naked factual assertions that need not be accepted as true, nor are they mere legal conclusions that can be disregarded. See Iqbal, 556 U.S. at 678. Instead, they are specific, detailed factual allegations that paint a plausible picture of an autonomous corporation operating in the commercial sphere largely free of state

46

oversight or interference, such that it would not be an affront to the dignity of Arkansas to permit this action to proceed.

Accordingly, given the operational independence established by these allegations, and the financial independence established by the state-treasury allegations discussed above, I believe it is at least plausible that ASLA is a "person" within the meaning of the FCA, not an arm of the state of Arkansas. See id. ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

IV.

ASLA, however, makes various arguments about how a judgment could affect the state treasury and points to various statutes indicating that the state has more control over it than Oberg's allegations suggest. In my view, these arguments do not provide a basis for granting the motion to dismiss. Even after Twombly and Iqbal, we still must view the properly alleged facts in the plaintiff's favor and must give the plaintiff the benefit of all reasonable inferences that can be drawn from those facts. See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011); see also Sepulveda-Villarini v. Dep't. of Educ. of P.R., 628 F.3d 25, 30 (1st Cir. 2010) (Souter, J.) ("A plausible but inconclusive inference from pleaded facts will

47

survive a motion to dismiss . . . .”). While ASLA's arguments are not frivolous, they are not so conclusive as to render Oberg's allegations implausible for purposes of Rule 12(b)(6). See Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011) ("Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is implausible."); Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc., 648 F.3d 452, 458 (6th Cir. 2011) ("[T]he plausibility of [the defendants' theory] does not render all other reasons implausible.").

## A.

ASLA argues that a judgment against it would affect the state treasury. Arkansas law requires the revenues from ASLA's business activities to be deposited into accounts outside the state treasury. See Ark. Code Ann. § 6-81-118(a), (b) & (f). Under provisions of Arkansas law not exclusively applicable to ASLA, all funds required to be deposited somewhere other than the state treasury are "'cash funds'" that are "declared to be revenues of the state to be used as required and to be expended only for such purposes and in such manner as determined by law." Ark. Code Ann. § 19-6-103. Such cash funds must be "budgeted and proposed expenditures approved by enactments of the General Assembly." Id. § 19-4-802(a). Relying on these statutes, ASLA contends that a judgment against it is, as a practical matter, a

48

judgment against Arkansas, since all of ASLA's money is really the state's money under § 19-6-103.

ASLA's argument overlooks several important points.  First of all, as the majority noted in its discussion of PHEAA's arm-of-state assertion, the fact that ASLA's funds are held in a segregated fund outside the state treasury counsels against arm-of-state status.  See Majority Op. at 13-14; see also Burrus, 546 F.3d at 420; Univ. of R.I. v. A.W. Chesterton Co., 2 F.3d 1200, 1210 (1st Cir. 1993).  Moreover, unlike the generally applicable § 19-6-103, the statute specifically addressing ASLA's funds does not declare ASLA's cash funds to be revenues of the state, see Ark. Code Ann. § 6-18-118, and nothing in § 6-18-118 appears to subject ASLA's use of the funds to wholesale control by the General Assembly.[3]  Instead, § 6-18-118 simply requires ASLA's segregated cash funds to be "used as provided in this subchapter" – subchapter 1 of Chapter 81 governing student loans.  Id. § 6-18-118(b) (emphasis added).  Subchapter 1, in turn, gives ASLA -- not the state legislature -- nearly complete authority over the use of its funds, including the authority to pay expenses arising from its lending activities.  See Ark. Code

---

[3] As the majority recognized when considering PHEAA's claim, the terms of the statute specifically governing ASLA should be given priority over the generally applicable § 19-6-103.  See Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384 (1992) ("[I]t is a commonplace of statutory construction that the specific governs the general . . . .").

49

Ann. § 6-81-118(c)(3) & (4) (giving ASLA authority to "use the proceeds of any bond issues, together with any other available funds" for "[p]aying incidental expenses in connection with loans" and "[p]aying expenses of authorizing and issuing bonds"); id. § 6-81-118(f) ("The revenues not deposited into the State Treasury shall be deposited into an account or accounts specified by resolution of the authority and used for carrying out the provisions of any resolution, indenture securing bonds of the authority, or other agreement of the authority under this subchapter."); id. § 6-81-124(a) (requiring "[a]ll proceeds derived from a particular obligation" to be deposited into a "proceeds fund" to be "expended only on approval of [ASLA]"); id. § 6-81-124(c)(1) (authorizing funds contained in proceeds fund to be used for "payment of the necessary expenses, including, without limitation, the costs of issuing the authority's obligations, incurred by the authority in carrying out its responsibilities under this subchapter").[4]

---

[4] Arkansas' statutory arrangement thus is similar in many ways to that in Pennsylvania. Like Arkansas, Pennsylvania law appears to treat the Loan Company's funds as state funds, see 24 Pa. Cons. Stat. § 5104(3) (requiring PHEAA's funds to be deposited into state treasury), and to require state approval of any expenditure of those funds, see 72 Pa. Cons. Stat. § 307, but the statute specifically governing PHEAA's operation gives control of those funds to the company, see 24 Pa. Cons. Stat. § 5104(3); see Majority Op. at 11-13 (describing operation of Pennsylvania statutes governing PHEAA). After considering Pennsylvania's statutory structure, the majority concluded that (Continued)

50

More importantly, however, the fact that Arkansas declares all of ASLA's cash funds to be state funds does not conclusively establish that the Arkansas state treasury would be affected by a judgment against ASLA in this case. As shown by the relevant statutes and other information in the record, the cash funds "claimed" by the state consist <u>entirely</u> of revenues generated by ASLA's lending and other business activities. And because the expenses of those business activities must be paid from the cash funds, the funds so claimed by the state in reality consist only of ASLA's surplus revenues.

As the Supreme Court has explained, however, the state-treasury factor focuses "<u>not on the use of profits or surplus</u>, but rather . . . on losses and debts." <u>Hess</u>, 513 U.S. at 51 (emphasis added)). "If the expenditures of the enterprise exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness of the enterprise? When the answer is 'No' -- both legally and practically -- then the Eleventh Amendment's core concern is not implicated." <u>Id.</u>

The majority's assertion that the source of the cash funds claimed by Arkansas does not matter because Arkansas claims all

---

the state-treasury factor "weighs heavily against holding that PHEAA is an arm of the state." Majority Op. at 14. In my view, Arkansas' similar statutory scheme also weighs against arm-of-state status.

51

of the cash funds as its own, see Majority Op. at 27-28 n.7, thus seems directly contrary to the Supreme Court's analysis in Hess. Under the majority's view, a self-supporting entity – that is, an entity that supports itself not through state appropriations but through the revenues earned from its own commercial activities – is dependent on the state as a matter of law because a state statute arguably declares the entity's profits to be revenues of the state. The Supreme Court raised a suspicious eyebrow at such an argument in Hess, see 513 U.S. at 51 n.21 (observing that "[i]t would indeed heighten a mystery of legal evolution were we to spread an Eleventh Amendment cover over an agency that consumes no state revenues but contributes to the State's wealth" (internal quotation marks and alteration omitted)), and the argument is no more persuasive here.

Oberg's allegations of a self-supporting, commercially insured corporation with tens of millions of dollars in annual revenue and access to a $50 million line of credit and other private loans provide a non-speculative basis for concluding that ASLA would not need Arkansas's help to pay a judgment rendered against it.[5] Nothing more need be established at this point in the proceedings. See Twombly, 550 U.S. at 555

---

[5] Indeed, the financial statements referenced in the pleadings show that ASLA absorbed an operational loss in 2011 without any financial assistance from the state. See J.A. 790.

52

("Factual allegations must be enough to raise a right to relief above the speculative level."); Walters, 684 F.3d at 439 (plaintiff's allegations must be sufficient to "advance [his] claim across the line from conceivable to plausible").

B.

The state-dignity factors of the arm-of-state inquiry include (1) "the degree of autonomy exercised by the entity"; (2) "whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns"; and (3) "how the entity is treated under state law." Oberg I, 681 F.3d at 580. As previously discussed, I believe that Oberg's allegations of a corporate entity that is answerable to boards of directors rather than elected state officials and that operates largely free of state interference plausibly establish that ASLA is not "so connected to the State that the legal action against the entity would, despite the fact that the judgment will not be paid from the State treasury, amount to the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties." Cash, 242 F.3d at 224 (internal quotation marks omitted).

I recognize, however, that other inferences can reasonably be drawn from the information alleged in the complaint and contained in the record. Nonetheless, the question at this stage of the proceedings is not whether the defendant's view of

53

the issues is reasonable, but whether the plaintiff has plausibly alleged an entitlement to relief. See, e.g., Butler 702 F.3d at 752 (motion to dismiss "test[s] the sufficiency of a complaint" but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses" (internal quotation marks omitted)). And in my view, the state-dignity factors do not conclusively establish that the Loan Companies are arms of their creating states, notwithstanding the fact that some of the factors might reasonably support that conclusion.

For example, Arkansas appears to treat ASLA as a state agency. See Ark. Code Ann. § 6-81-102(c) (describing ASLA an "an instrumentality of the state"); Turner v. Woodruff, 689 S.W.2d 527, 528 (Ark. 1985) (describing ASLA as a "state agency"). While this factor thus points toward a finding of arm-of-state status, whether an entity qualifies as an arm of its creating state is a matter of federal law, see Regents, 519 U.S. at 429 n.5, and this single factor is not dispositive of the inquiry.

In addition, there can be no dispute that ASLA is involved, at least in part, in matters of statewide concern. "[E]ducating the youth" of a state and providing higher education is "clearly an area of statewide concern," Md. Stadium Auth. v. Ellerbe Becket Inc., 407 F.3d 255, 265 (4th Cir. 2005), and making loans

54

available to students certainly facilitates that goal. However, ASLA is also engaged in other, more commercial activities, such as the buying and selling of loan pools on the secondary market and the servicing of federal student loans, that arguably are more appropriately characterized as "non-state concerns." See Hoover Universal, 535 F.3d at 307 (considering "whether the entity is involved with statewide, as opposed to local or other non-state concerns" (emphasis added)); cf. Fresenius Med. Care Cardiovascular Res., Inc. v. Puerto Rico, 322 F.3d 56, 64 (1st Cir. 2003) ("Not all entities created by states are meant to share state sovereignty. . . . Some entities may be meant to be commercial enterprises, viable and competitive in the marketplace in which they operate.").

As to the question of autonomy, the fact that ASLA generates its own revenues and is not dependent on state appropriations is a strong indication of the Loan Companies' operational independence from the states. While ASLA receives an appropriation earmarked for salaries and certain other expenses, it is an appropriation of ASLA's own "cash funds," J.A. 412, which, as previously discussed, are funds generated by ASLA through its business activities. That kind of appropriation does not make ASLA dependent on the state. See Burrus, 546 F.3d at 422 (appropriation of funds generated by entity claiming arm-of-state status "is of a different kind than

the appropriations we have found to be the mark of a state agency, namely, those appropriations that come directly from the state." (internal quotation marks omitted)).[6]

Other facts, however, suggest that ASLA is not entirely autonomous. For example, all members of ASLA's board of directors are appointed by the governor, see Ark. Stat. Ann. § 6-81-102(d), a fact that clearly provides some indication of state control. See Md. Stadium Auth., 407 F.3d at 264. Arkansas law, however, provides that the board members serve fixed terms, see Ark. Stat. Ann. § 6-81-102(e), with no suggestion that they may be removed by the governor at will.[7] See Edmond v. United States, 520 U.S. 651, 664 (1997) ("The power to remove officers, we have recognized, is a powerful tool

---

[6] In any event, even if ASLA did receive some money from the state, that fact alone would not conclusively establish that ASLA is dependent on the state. See, e.g., Kitchen v. Upshaw, 286 F.3d 179, 184-85 (4th Cir. 2002) (finding that an entity that received some state funding was not an arm of the state); Cash, 242 F.3d at 224, 226 (same).

[7] According to the majority, the fact that ASLA board members serve for four years "or until a successor is appointed," Ark. Code § 6-81-102(e), "suggests that the governor may remove board members simply by selecting new ones." Majority Op. at 29 (emphasis added). It seems highly unlikely that the Arkansas legislature would hide removal-at-will authority in a clause that more reasonably seems to authorize terms of more than four years in cases where an appointment is not timely made. In any event, an ambiguous statutory scheme is far from sufficient to establish for purposes of a Rule 12(b)(6) motion that ASLA's board is subject to the direct control of the governor.

for control."); <u>Auer v. Robbins</u>, 519 U.S. 452, 456 n.1 (1997) (concluding that Board of Police Commissioners was not an arm of the state because the state was not responsible for the Board's financial liabilities and the only form of state control was the governor's power to appoint four of five Board members); <u>P.R. Ports Auth. v. Fed. Mar. Comm'n</u>, 531 F.3d 868, 877 (D.C. Cir. 2008) ("The Governor's power to remove a majority of the Board at will allows him to directly supervise and control PRPA's ongoing operations."); <u>Takle v. Univ. of Wisc. Hosp. & Clinics Auth.</u>, 402 F.3d 768, 770 (7th Cir. 2005) ("[T]he power to appoint is not the power to control.").[8]

In addition, all bonds issued by ASLA must be approved by the governor, a fact the majority finds significant. <u>See</u> Majority Op. at 27-28 (including gubernatorial approval requirement among the facts establishing that ASLA "operates with little autonomy"). The approval requirement, however, is a function of federal law, which places a ceiling on the volume of

---

[8] Contrary to the majority's characterization of my views, I do not contend that ASLA "<u>is</u> autonomous" because of the manner in which its board is appointed, Majority op. at 28 (emphasis added), only that Oberg <u>has alleged specific facts relevant to ASLA's autonomy sufficient to survive a Rule 12(b)(6) motion.</u> As I have previously discussed, the fact that other inferences can be drawn from the information in the record does not render Oberg's allegations implausible. <u>See</u> <u>Sepulveda–Villarini v. Dep't. of Educ. of P.R.</u>, 628 F.3d 25, 30 (1st Cir. 2010) (Souter, J.) ("A plausible but inconclusive inference from pleaded facts will survive a motion to dismiss . . . .").

certain tax-exempt "private activity" bonds (including student loan bonds) that can be issued within a state and vests with the state governor the authority to change the allocation of the state ceiling among issuers, and which requires state approval of such bond issues. See 26 U.S.C. § 141(e)(1)(E); id. § 144(b); id. § 146(a)-(e); id. § 147(f); see generally Steele v. Indus. Dev. Bd. of Metro. Gov't Nashville, 301 F.3d 401, 404 (6th Cir. 2002); Congressional Research Service, Tax-Exempt Bonds: A Description of State & Local Government Debt at 9-11 (June 19, 2012). Under these circumstances, the gubernatorial-approval requirement is less indicative of a lack of autonomy than it might otherwise be. In any event, the gubernatorial-approval requirement does not conclusively establish that ASLA lacks autonomy.

Thus, on the record before us, the facts relevant to the state-dignity factors cut both ways, with some supporting Oberg's claim that ASLA is not an arm of the state, and others supporting ASLA's contrary claim. But because Oberg's allegations on this point more than satisfy the Iqbal-Twombly plausibility requirement, ASLA's arguments provide no basis for affirming the dismissal of Oberg's claims.

V.

As is apparent from the arm-of-state test itself and the nature of the considerations it entails, whether a state-created entity is so closely connected to its creating state that it should be permitted to share in the state's immunity from suit generally is a fact-intensive inquiry dependent on an understanding of the <u>actual</u> operations of the entity and the <u>actual</u> relationship between the entity and the state. <u>See, e.g.</u>, <u>Hess</u>, 513 U.S. at 49 (considering the entity's "anticipated and <u>actual</u> financial independence (emphasis added)); <u>Hoover</u>, 535 F.3d at 303 ("The line separating a State-created entity functioning independently of the State from a State-created entity functioning as an arm of the State or its alter ego is determined by the particular legal and <u>factual circumstances</u> of the entity itself." (emphasis added)); <u>Gray</u>, 51 F.3d at 434 (remanding case to the district court because it was "in the best position to address in the first instance the competing questions of fact and state law necessary to resolve the eleventh amendment issue" (internal quotation marks omitted)). While there certainly have been and will continue to be cases where the arm-of-state issue can be resolved on the pleadings, multi-factored balancing tests "do[] not easily lend [themselves] to dismissal on a Rule 12(b)(6) motion." <u>Decotiis v. Whittemore</u>, 635 F.3d 22, 35 n.15 (1st Cir. 2011). In my

view, this case is one of the typical cases that cannot be resolved on the pleadings. Indeed, the inconclusive nature of most of the state-dignity factors highlights this very problem. We have no information about the actual operations of the Loan Companies or the actual amount of control and oversight exercised by the states and thus cannot determine the actual nature of the relationship between the Loan Companies and their creating states.

Nonetheless, the facts as alleged by Oberg plausibly establish that the state treasuries will not be affected by a judgment against the Loan Companies and that the Loan Companies are sufficiently independent from their creating states that permitting this action to proceed would not be an affront to the dignity of the states. To require anything more at this stage of the proceedings is to ignore the purpose and scope of a motion to dismiss, which is to test the facial sufficiency of the complaint, not resolve contests about the merits or applicable defenses. See Butler, 702 F.3d at 752; Goodman, 494 F.3d at 464.

Accordingly, while I concur in the judgment insofar as it vacates the dismissal of the claims against PHEAA and VSAC, I dissent from the opinion and judgment affirming the dismissal of the claims against ASLA.